UNITED STATES of America, Plaintiff–Appellee,

v.

Carl VELTMANN and Christopher Veltmann, Defendants–Appellants.

No. 92–2762.

United States Court of Appeals, Eleventh Circuit.

Nov. 15, 1993.

Allan A. Ackerman, Chicago, IL, for Carl Veltmann and Christopher Veltmann.

Joseph K. Ruddy, Asst. U.S. Atty., Tampa, FL, for U.S.

Before FAY and HATCHETT, Circuit Judges, and JOHNSON, Senior Circuit Judge.

FAY, Circuit Judge:

Defendants Chris Veltmann and Carl Veltmann were convicted of matricide and uxoricide respectively.[1] Each defendant was also found guilty on twenty eight counts of mail and wire fraud based on insurance claims arising from Elizabeth Veltmann's death and fire damage to the family home.[2] Defendants appeal their convictions based on the trial court's (1) denial of their motions for judgment of acquittal, (2) use of a non-pattern reasonable doubt instruction, (3) admission of evidence of prior, remote, non-similar fires, (4) exclusion of state-of-mind evidence, and (5) admission of Chris Veltmann's post-arrest statements implicating Carl Veltmann. We AFFIRM the trial court's denial of defendants' motions for acquittal, and find no error in the reasonable doubt instruction given. We REVERSE, however, on several of the trial court's evidentiary rulings.

## FACTS

Elizabeth Veltmann ("Elizabeth") died the evening of January 7, 1990 during a fire in the home she shared with her husband, Carl Veltmann ("Carl"). The couple had just returned from a week-long honeymoon cruise with Elizabeth's son, Christopher Veltmann ("Chris"), and his new bride.

The fire was caused by arson; the crux of the case is the identity of the arsonist(s). The government theorized that Carl and Chris set fire to the house with the knowledge that Elizabeth was inside and with intent to recover proceeds under various insurance policies.[3] Defendants argued that Eliz-

abeth, beset with fiscal worries and physical maladies, committed suicide after setting fire to the home. To evaluate the sufficiency of the evidence and harmlessness of evidentiary rulings, we must review in some detail the relevant facts pertaining to the fire, Elizabeth's state of mind, and the circumstantial case against the defendants.

### I. The Fire

On January 7, 1990, at 9:41 p.m., a neighbor called 911 after hearing an alarm and seeing smoke and flames coming from a second floor window of the Veltmann's three story residence. Firefighters broke into the house through the locked front door and found Elizabeth unconscious in the third floor master bedroom. She could not be revived. No one else was found in the home.

The investigation revealed the fire had three separate points of origin. The majority of damage was caused by a fire in the first floor foyer. This fire was started with newspapers and possibly a small amount of accelerant. The second fire was in the garage and the third in the dumbwaiter in the second floor kitchen. These two fires essentially "went nowhere." The oven was turned onto the "clean" position, and a firefighter reported that the burners were glowing. Experts' estimates of the burn time[4] ranged from twenty to fifty minutes. It seems that the fires were lit between roughly 8:50 p.m. and 9:20 p.m.

None of the ten smoke detectors in the residence were sounding when firefighters arrived. The government contended that the smoke detectors were "disarmed" before the fire was set.[5] Seven batteries were recov-

1. Indictment was pursuant to 18 U.S.C. § 844(i).

2. Indictment was pursuant to 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

3. The combined valued of insurance policies on the home and on Elizabeth Veltmann was $1,123,939. The residence was insured in amounts totaling $638,939. Elizabeth had four life insurance policies totaling over $485,000 naming Carl beneficiary.

4. "Burn time" refers to the total amount of time the fire burned before it was extinguished.

5. Two second floor smoke detectors were examined; their batteries were pulled back from the contact points, making them inoperative. The smoke detectors on the third floor, where the heat was greatest, had melted and fallen to the ground. Batteries from these detectors were found on the floor, separated from the detector apparatus. It is possible for the plastic retaining clips holding the batteries in place to melt in intense fire heat, allowing the batteries to fall free from the detectors. Government witnesses postulated, however, that had the batteries been properly connected, they would not have fallen free even if the plastic retainers melted. Accordingly, fire investigators concluded that the third

ered; all functioned when properly connected. One smoke detector did not contain batteries at all. According to Carl, two smoke detectors were hooked up to operate electrically. None of the smoke detectors or the batteries were fingerprinted. The plug portions of the batteries were not tested by the government for carbon deposits which may have revealed whether they were connected to the detectors during the fire. Defendants' fire investigator testified that given the absence of soot inside some smoke detectors and underneath the contact points, the batteries were fully connected during the fire. Defendants further argued that the third floor batteries must have fallen out during the fire because soot deposits were observed *under* the batteries rather than around them.

There was contradictory evidence about the home protection system. The Veltmanns were convinced they were protected by a combined burglar/fire alarm system. Government witnesses, however, testified that the alarm system did not monitor for fires at all. The system, when properly installed, had a "line seizure" mechanism. When such a device is triggered it "seizes" the phone lines and automatically calls the monitoring service. The government argued that the alarm was deactivated before the fire because it was "parallel wired" which prevented the system from seizing the phone line if any telephone in the house was off the hook.[6] In fact, the master bedroom telephone was off the hook with the receiver lying on the floor next to the bed. The absence of soot under the phone indicated it was on the floor during all or most of the fire. Testimony suggested that the phone was off the hook from at least 7:00 p.m. on January 7th. Accordingly, even if the system were equipped with fire detec-

tion devices as defendants believed, it could not have called the monitoring station when the fire began. However, the audible alarm outside the house was apparently triggered at some point during the fire which bolsters defendants' suggestion that the system was working.[7]

The government emphasized that Elizabeth was locked inside the house with no means of escape.[8] Firefighters believed that all exterior doors required an inside key to be unlocked, however, it appears that only the front door and perhaps one other was so equipped. The sliding glass door in the master bedroom opened onto a screened porch; there was no testimony that this door was locked. The government claimed that all windows were shut, creating an oven-like effect. However, at least three witnesses saw flames coming out of a second or third floor window.

There was no forced entry into the house other than that made by firefighters. Although numerous people had access to keys, there were apparently no suspects other than Carl and Chris who had both access to the house and knowledge of the home protection systems.

## II. Elizabeth Veltmann's State-of-Mind

The defense's case rested on proof that Elizabeth was suicidal. Elizabeth's autopsy revealed that her blood-alcohol level at death was .149, with a .33 level of Dalmane, a prescription sedative, in her system. Carbon monoxide test samples yielded a 73 to 75 percent result evidencing the cause of death as acute carbon monoxide intoxication from the inhalation of smoke and gases. The physician testified he did not consider suicide

---

floor smoke detectors were also disarmed before the fire.

6. Chris originally installed the alarm system. The master panel was replaced one or two years before the fire. It is unclear from the record whether the alarm company or Chris completed the reinstallation. There was no evidence of tampering with the telephone wires into the alarm system.

7. The house was also equipped with two motion detectors that the Veltmanns believed sensed

both fire and movement. In fact, the devices sense heat generated by a moving body, but are not fire detectors. The manufacturer's representative agreed that a buyer could be misled by misrepresentations of a seller into believing the system detected fire.

8. Elizabeth's purse containing keys to the house could not be found during the fire investigation, but was later produced by Chris after he found it in the trunk of the car in the garage.

because it was not suggested by the police. Although Elizabeth was discovered two feet away from the sliding glass door, there is no forensic evidence that she was attempting to escape because her feet were not analyzed for soot deposits. She was found lying face down on the floor, clutching a tissue or handkerchief, nearby bills, bank statements, and family photos strewn across the floor. Approximately a year and a half after her death, Carl found an undated suicide note written by Elizabeth.[9] The authenticity of the note was not challenged.

Contradictions permeate evidence of Elizabeth's physical and psychological condition. Elizabeth and Carl were married for twenty-five years, were business partners, and were described by a number of witnesses as a loving and devoted couple. Elizabeth was happy about Chris' recent marriage and excited about the honeymoon cruise. But numerous indicators point to Elizabeth's deep distress over her medical and financial problems.

Elizabeth suffered from a variety of physical maladies.[10] She was treated for years with a variety of pain killers, and eventually became a prescription drug addict. In 1987, Elizabeth suffered respiratory arrest as a result of a self-induced drug overdose. Psychiatrists suspected a suicide attempt, but Elizabeth steadfastly refused to admit she was depressed and checked out of the hospital against medical advice. An addictionologist concluded that Elizabeth eventually became desperate for drugs as evidenced by stockpiling her supply, forging a prescription, obtaining drugs in her father's name, and

trying to manipulate a nurse and another friend into providing her with drugs illegally. The expert postulated that she took most or all of the drugs in her system near the time of death. He concluded that the sudden infusion of alcohol and prescription drugs was consistent with suicide by overdose. But with a delay of fifteen to sixty minutes between taking the drugs and becoming incapacitated by their effect, considering her tolerance level, Elizabeth was probably able to set a simple fire and negotiate the stairs in the house (or operate the elevator) for some period of time after taking the drugs. The government's expert believed that given her level of drug intoxication, Elizabeth was not ambulatory during the time in which the fire must have been set.

In addition to being chemically dependent, Elizabeth was deeply troubled about what seemed to be impending financial ruin. She needed money for drugs and was trying to keep her dependency a secret. The Veltmann's corporation filed for bankruptcy in December, 1989. Their home, built in 1985 with Elizabeth as general contractor, was on the market. In the months preceding her death, Elizabeth tried to borrow money from a number of people.

The most telling indicator of Elizabeth's monetary dilemma and mental state was not admitted into evidence. In a videotaped deposition, Carl Engstrom testified that Elizabeth extracted $500,000 from him over the past twenty-five to thirty years. She was apparently blackmailing him based on their brief affair that took place when she was married to her first husband. Engstrom be-

---

**9.** The note was inside a picture frame that was in Carl's study during the fire. It read:

> I so loved you, and I know you loved me. It has been so very hard the last years for both you and me. Life I have enjoyed with you. I am so—I am so sorry we didn't quite make it all the way. Take good care of the rest of our family, Patricia and Christopher, and please don't hate me for this. If God ever blessed someone, it was you. As your mom has always said to you, she was so right. You, my loved one, have always been right. Be strong. Don't let the world tell the Veltmanns they were not the very best. See you again in heaven or hell, more like heaven, my love, Your Elizabeth.

Defendants suggested that the note was written near the time of death because Elizabeth referred to Patricia as "family" and Patricia and Chris were not married until December 23, 1989, two weeks before the fire.

**10.** Elizabeth's medical history started with migraines when she was a teenager. She underwent surgery twice in the 1970's, and was diagnosed with ovarian cancer in 1987. Following more surgery and chemotherapy, the cancer went into remission, but Elizabeth continuously suffered from unexplained pains including a burning sensation in her mouth, migraines, stress reactions, and an ulcer. She apparently believed the cancer would recur and was hospitalized on several occasions.

lieved that Elizabeth would eventually pay him back because she frequently promised to do so. A few months before she died, Elizabeth talked to Engstrom about the possibility of her death, and instructed him to see Chris about being paid when she was gone. She mentioned suicide several times. In early December, 1989, Engstrom sent money which Elizabeth never picked up. She called him again for money on December 31 or January 1st, from Miami, where she was waiting to board the cruise ship. She called him collect from the Cayman Islands on January 6th, again demanding money. He refused. On January 7th, just one hour after returning home from the cruise, Elizabeth called Engstrom. She told him she had $275,000 for him, and needed money to come to Chicago to make payment.[11] He told her to mail a check and refused "in no uncertain terms" to send her anymore money. Her response was, "Well, I'm all washed up then." Def. Ex. VV. The conversation lasted two minutes. She did not threaten suicide in that call.

An addictionologist testified that suicidal ideation typically develops over two or three years, and that Elizabeth's earlier suicide threats to Engstrom were evidence of suicidal thinking. In the expert's view, Engstrom's cutting off of funds that Elizabeth could use for drugs was the "major precipitating event" in her suicide.

The financial picture was not entirely gloomy. The Veltmanns were willing to accept an incoming offer of $1,200,000 for the house and an adjacent lot. Carl testified that this money would be used to pay off mortgages with the balance infused into their failing corporation. But Elizabeth told friends that she did not want to live any longer, and that no one would have her house after she was gone; she believed Carl would remarry after her death, but "another Mrs. Veltmann" would not have what she had. Elizabeth said she would destroy everything.

## III. The Evidence Against Carl and Chris Veltmann

The evidence against the defendants is entirely circumstantial. The government argued that the arson and murder were motivated by greed[12], and that defendants had the opportunity and knowledge to commit the crime.

On the date of the fire, the two Veltmann couples returned from the honeymoon cruise. Elizabeth had a migraine early in the morning hours of January 7th, and received a shot of Demoral from the ship's doctor before disembarking. She was also suffering from dysentery. Chris and his wife were dropped off at their nearby home, and Carl and Elizabeth returned to the Veltmann residence at about 3:30 p.m. A witness saw Chris' car parked in their driveway at around 6:00 p.m. There is little agreement about what happened next.

Chris did not testify at trial, but he made a statement to investigators that was audiotaped and played for the jury. According to Chris, he stopped by his parent's home around 6:30–7:00 p.m. after going by the post office. He intended to check on his mother, knowing she was not well. When he got there, Carl was preparing to leave for a hunting trip in Montana and Elizabeth was resting in bed. Chris visited with his parents and returned to his home at around 8:00 or 8:30 p.m. According to Chris, Carl showed up at his house sometime later, visited for a hour or so and then left.

The remainder of the case against Chris rests on his knowledge of the alarm system, his role in making insurance claims, his receipt of some insurance proceeds, and conflicting testimony about his emotional reaction to news of his mother's death. It was Chris who found Elizabeth's missing purse and keys in the trunk of a car in the garage.

11. Elizabeth also told Engstrom that she was afraid of Carl and needed somewhere to "hide out." Elizabeth's comments about fearing Carl, had they been admitted, might well have cut against defendants' theory of the case, just as her suicide threats would bolster the defense.

12. The parties disagreed about whether sale of the house or recovery of insurance proceeds would net Carl more money. The question was a close one. It is undisputed that Carl gave Chris some of the insurance money; Carl testified he simply repaid loans Chris made to help his parents.

Additionally, David Meehan, Chris' cellmate, testified to admissions allegedly made by Chris while in custody. According to Meehan, Chris said the fire was started in two places; Chris started the kitchen fire and turned on the range, and Carl started the fire in the foyer with paper and lighter fluid after taking the tops off the smoke detector batteries.[13] Chris allegedly said he and Carl watched the wallpaper in the hallway catch fire before leaving through the garage, and that Carl visited his home for only a few minutes before driving to the Tampa airport and flying out to go hunting.

Carl made statements to fire, police, and insurance investigators, and testified at trial. He said he left the residence at about 9:00 p.m. with Chris, leaving Elizabeth resting in bed. He followed Chris to his house and visited until approximately 10:30 p.m. He then left to go hunting and attempt to raise money in Montana, intending to get the car serviced and meet with his bankruptcy attorney en route. He decided to make this trip on the spur of the moment, testifying at trial for the first time that he did not simply spend the night in his house because Elizabeth was "ragging on him" about their finances. He spent the night in a motel. He did not have appointments with the lawyer or car dealership, but the lawyer testified that he did expect Carl in his office on the afternoon of the January 8th. In Montana, Carl planned to visit an acquaintance. This man testified that he had not heard from Carl since 1971, no longer owned the property on which Carl had hunted, and would not have loaned him money.

Carl called Chris on the morning of January 8th only to learn of Elizabeth's death. He returned home and met with the police. His statement was somewhat vague regarding his actions prior to leaving the house, but was quite specific about his trip after leaving Chris'. Carl also testified that when he found the suicide note in October 1991, he dated it January 7, 1990, because that was the date of Elizabeth's death.

Terry Price, Carl's cellmate, testified that Carl told him the fire was set with lighter fluid, but that he left for Montana the day before the fire and was hunting when the fire started. Carl allegedly told Price he went to Montana to hunt and raise money, and that the alarm and smoke detectors were not working. Price also overheard Carl talking on the phone to someone about Chris, saying "I told him to keep his mouth shut." Price testified that Carl said he dated the suicide note "January 7, 1990" because the insurance companies would not pay off otherwise; presumably Carl believed that the note should be dated, and that the date of death was most likely to promote payment by the insurers.

A business associate of the Veltmanns testified that Carl once suggested to him that he simply burn down a problem piece of property, and that Carl explained to him how to set the fire, while cautioning him to establish a good alibi. The jury also heard about previous fires on property owned by defendants. In the early 1970's, a vacant house owned by Elizabeth and Carl was destroyed in a fire. In 1985, the cottage owned by the Veltmanns on property adjacent to the residence that is the subject of this case was also destroyed by fire.[14] The cottage was rented to a former housekeeper of the Veltmanns who claimed that the Veltmanns caused the fire. Neither of these fires resulted in charges being filed against any of the Veltmanns.

Carl denied having anything to do with the arson to his residence and with the death of his wife. Both defendants were convicted on all counts and sentenced to life in prison.

### STANDARD OF REVIEW

 The first two issues raised by defendants concern the denial of motions for judgment of acquittal based on the sufficiency of the evidence. The evidence must be reviewed in the light most favorable to the government. *United States v. McKinley*, 995 F.2d 1020, 1025 (11th Cir.1993). Convictions will be affirmed if "any reasonable construction of the evidence allowed the jury to

---

13. Carl's objection to this testimony was overruled.

14. Defendants objected to introduction of evidence of all prior fires.

find the appellants guilty beyond a reasonable doubt." *Id.* The next issue concerns the reasonable doubt jury instruction. Reasonable doubt instructions are reviewed as a whole to determine whether they correctly state the substance of the law and the facts. *United States v. Daniels,* 986 F.2d 451, 456 (11th Cir.1993). But reasonable doubt instructions are not subject to harmless error analysis; if constitutionally deficient, reversal is required. *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993). The final three issues concern evidentiary rulings. Evidentiary rulings challenged on appeal will not be overturned absent clear abuse of discretion. *United States v. Kelly,* 888 F.2d 732, 743 (11th Cir. 1989). The question of whether an alleged *Bruton* violation warrants reversal of conviction is subject to a harmless error analysis. *United States v. Bennett,* 848 F.2d 1134, 1142 (11th Cir.1988).

## DISCUSSION

### I. Denial of Motions for Judgment of Acquittal

The first two issues are dealt with in summary fashion. Defendants challenge the district court's denial of judgment of acquittal based on insufficiency of the evidence regarding use of the Veltmann property in interstate commerce as required by 18 U.S.C. § 844(i). We find this argument without merit and discuss it no further.

■ Defendants also assert there was insufficient evidence to support findings of guilt, alleging error in the trial court's denial of their timely motions for acquittal. We must, of course, view the evidence in a light most favorable to the government. *McKinley,* 995 F.2d at 1025. We cannot agree with defendants. The evidence admitted regarding the smoke detector and alarm systems, statements made to cellmates, defendants' inconsistent statements about their actions that evening, Carl's commentary about how to commit arson, and the previous fires on Veltmann property precludes a finding that based on the evidence before them a jury could not have found Carl and Chris Veltmann guilty beyond a reasonable doubt. Be-

cause we reverse and remand for new trial based on evidentiary error, this issue needs no further analysis.

### II. The Reasonable Doubt Instruction

■ The defendants contend they were denied a fair trial because the district court utilized a non-pattern reasonable doubt instruction that impermissibly altered the quantum of proof. The challenged jury charge reads as follows:

I have said that the government must prove each defendant guilty beyond a reasonable doubt. The question naturally is, what is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all the evidence. It is a doubt which would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.

Proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

*A reasonable doubt is not a caprice or a whim. It is not a speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty, and it is not sympathy.*

In a criminal case the burden is at all times upon the government to prove guilt beyond a reasonable doubt. The law does not require that the government prove guilt beyond all possible doubt. Proof beyond a reasonable doubt is sufficient to convict. This burden never shifts to the defendants. Which means that it is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt.

If after fair and impartial consideration of all of the evidence you, the jury, have reasonable doubt as to the guilt of any of the defendants, it is your duty to acquit that defendant. On the other hand, if after fair and impartial consideration of all the evidence you are satisfied of the defen-

dant's guilt beyond a reasonable doubt, you should vote to convict the defendant. R. 9–24–6 (emphasis added).

Defendants objected to this instruction because it does not match the Eleventh Circuit pattern instructions. Specifically, defendants objected to inclusion of the underlined language.

In reviewing "reasonable doubt" charges, we must consider the instruction as a whole. *United States v. Daniels*, 986 F.2d 451, 456 (11th Cir.1993). It is well settled that a trial judge has broad discretion in formulating jury instructions. *Id.* Nonetheless, a constitutionally deficient reasonable doubt instruction is not subject to harmless error analysis and requires reversal of conviction. *Sullivan*, —— U.S. at ——, 113 S.Ct. at 2082 (misdescription of the burden of proof vitiates all the jury's findings).

At the outset, we note that district courts are not required to use the Pattern Jury Instructions of the District Judges Association of the Eleventh Circuit (1985). We have on countless occasions approved jury instructions which did not exactly track pattern language.[15] A rigid requirement of adherence to the pattern instructions would contradict the basic tenet that a trial judge has considerable discretion in this area. The Pattern Jury Instructions are there as a convenience to the bench and bar.

The issue before this Court is whether the instruction given, taken as a whole, is constitutionally deficient because it misdescribes the burden of proof. We cannot agree with defendants that the instruction is infirm.

Defendants invoke *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam) in support of their argument. In *Cage*, the Supreme Court reversing a conviction, held that the challenged reasonable doubt instruction suggested a higher degree of doubt than was required for acquittal. The instruction read, in relevant part:

> ... This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and *not upon mere caprice and conjecture.* It must be such doubt as would give rise to a grave uncertainty.... [i]t is an actual substantial doubt.... What is required is not an absolute or mathematical certainty, but a moral certainty.

*Id.* at 40, 111 S.Ct. at 329 (original emphasis deleted; emphasis added). The Court focused not upon the "mere caprice and conjecture" language, but on the quantum of proof suggested by the words "actual substantial doubt" and "moral (rather than evidentiary) certainty." *Id.* at 41, 111 S.Ct. at 330.[16]

Similarly, this Circuit has on at least two occasions approved reasonable doubt instructions containing language similar to that now challenged. *United States v. Turk*, 526 F.2d 654, 669 (5th Cir.1976) ("Such doubt must be substantial rather than speculative, that is, a defendant is never to be convicted upon mere suspicion or conjecture."), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *United States v. Fernandez*, 496 F.2d 1294, 1297 (5th Cir.1974) ("reasonable doubt does not arise from a mere conjecture, speculation or whim, nor does it arise from a reluctance to convict [ ] through a feeling of sympathy or mercy"). In each of these cases the language about which defendants here complain was incorporated within a lengthy instruction, but was not recognized by the court as bearing upon the quantum of proof.

---

**15.** *See e.g., United States v. Daniels*, 986 F.2d 451, 456 (11th Cir.1993); *United States v. Beard*, 960 F.2d 965, 969 (11th Cir.1992); *United States v. Nixon*, 918 F.2d 895, 902 (11th Cir.1990); *United States v. Broadwell*, 870 F.2d 594, 609 (11th Cir.), *cert. denied*, 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989); *United States v. Acosta*, 748 F.2d 577, 581 (11th Cir.1984); *United States v. Pepe*, 747 F.2d 632, 675 (11th Cir. 1984); *United States v. Alonso*, 740 F.2d 862, 877 (11th Cir.1984), *cert. denied*, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985); *United States v. Solomon*, 686 F.2d 863, 867 (11th Cir.1982); *United States v. Bottom*, 638 F.2d 781, 787 (5th Cir. Unit B 1981); *United States v. Jones*, 663 F.2d 567, 571 (5th Cir. Unit B 1981).

Decisions of the Court of Appeals for the Fifth Circuit handed down before October 1, 1981 were adopted as precedent by the Court of Appeals for the Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc).

**16.** Defendants' attempt to equate the word "sympathy" in the instruction at bar, with "moral certainty" as discussed in *Cage*, is unavailing.

In *United States v. Edelin*, 996 F.2d 1238 (D.C.Cir.1993) (per curiam), the court analyzed a reasonable doubt instruction based on a challenge to precisely the same terminology complained of here.[17] The court held that the instruction did not mislead the jury by impermissibly lowering the burden of proof. *Id.* at 1243. The court noted that use of the *negative* expressions "not suspicion" and "not speculation" did not make an instruction nearly as exacting as the "actual substantial doubt" and "grave uncertainty" terminology rejected by the Court in *Cage*. *Id.* at 1243. *See also, United States v. Morris*, 647 F.2d 568, 571 (5th Cir. Unit B 1981) (the distinction between "cause a reasonable person to hesitate" and "act without hesitation" is without substance).

We do not believe that the challenged language misled the jury when taken as a whole. The instruction more than adequately describes a reasonable doubt using language previously approved by this circuit and elsewhere. The offensive sentence was preceded by two paragraphs on the government's burden of proof, and succeeded by more instruction on the duty to acquit in the presence of a reasonable doubt. Accordingly, we hold that the district court did not err in giving this non-pattern reasonable doubt instruction.

■ We are troubled however, by an argument first raised in Defendants' reply brief concerning the absence of instruction on the presumption of innocence at the beginning of the trial. Scrutiny of the record reveals that the presumption of innocence was not mentioned by the court even once before, during, or after voir dire of the jury. Defendants questioned this omission. Although the court charged the jury on the presumption before they retired to deliberate, we believe it extraordinary for a trial to progress to that stage with nary a mention of this jurisprudential bedrock. *Kentucky v. Whorton*, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (per curiam); *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978); *In re Winship*, 397 U.S. 358, 90 S.Ct.

1068, 25 L.Ed.2d 368 (1970); *Coffin v. United States*, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895); *United States v. Dilg*, 700 F.2d 620 (11th Cir.1983).

The issue was waived by defendants' failure to raise it earlier. *United States v. Kimmons*, 1 F.3d 1144, 1145–46 (11th Cir. 1993); *United States v. Benz*, 740 F.2d 903, 916 (11th Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). We recognize that a visiting judge heard the case, and that it will be retried before another. Consequently, it is not necessary to further discuss this omission.

## III. The Evidentiary Rulings

### A. State of Mind Evidence

■ Defendants appeal the trial court's exclusion of Carl Engstrom's videotaped deposition. Defendants offered the deposition as relevant hearsay, admissible pursuant to Fed.R.Evid. 803(3), reflecting Elizabeth's state-of-mind. The government objected, claiming that decedent did not threaten suicide in the last phone call with Engstrom, and that threats of suicide in months preceding her death were inadmissible hearsay and irrelevant. The district court agreed with the government, also finding the information cumulative and collateral, and excluded the deposition testimony. We believe the trial court erred. The deposition was admissible under the state of mind exception, and while conceivably cumulative, its import was such that exclusion violated defendants' right to put on a defense. This abuse of discretion requires reversal.

■ Rule 803(3) of the Federal Rules of Evidence allows the admission of "... [a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)...." The declarant's statement of mind must be relevant to some issue in the case before such testimony can be admitted under Rule 803(3). *T. Harris Young & As-*

---

17. The second paragraph of the challenged instruction read:
 "A reasonable doubt is not a caprice or whim. It is not speculation or suspicion. It is not an

excuse to perform an unpleasant duty, and it is not sympathy." *Edelin*, 996 F.2d at 1242.

soc. v. Marquette Electronics, Inc., 931 F.2d 816, 828 (11th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); Prather v. Prather, 650 F.2d 88, 90 (5th Cir. Unit A 1981).

■ A homicide victim's state of mind is unquestionably relevant to the defense theory that she committed suicide.[18] The government maintains that Elizabeth's earlier suicide threats and references to dying were too remote to make Engstrom's testimony relevant. The time lag between Elizabeth's references to dying and her death warrants further examination.

In In re Fill, 68 B.R. 923 (Bankr.S.D.N.Y. 1987), an action to avoid allegedly fraudulent transfers, the transferee was permitted to offer state of mind hearsay evidence of the debtor's declarations that he intended to repay the loans even though such statements were made six years before actual repayment. The court discussed a continuity of time concept relevant to the state of mind inquiry, quoting a leading commentator as follows:

Although it is required that the statement describe a state of mind or feeling existing at the time of the statement, the evidentiary effect of the statement is broadened by the notion of the continuity of time in states of mind.... Since, however, the duration of state of mind or emotion varies with the particular attitudes or feelings at issue and with the cause, it is reasonable to require as a condition of invoking the continuity notion that the statement mirror a state of mind which, in light of all the circumstances including proxity [sic] in time, has some probability of being the same condition existing at the material time....

Id. at 928, citing McCormick, Evidence, § 294, at 844–45 (Cleary, 3d ed. 1984) (emphasis added).

The court noted that substantial weight must be given to the "significant number of years between the making of the statement that the loans would be repaid and the actual repayment of the loans...." Id.

The temporal relationship between Elizabeth's statements and her death is far less attenuated than the six year time lag analyzed in Fill. Where one threatens suicide, talks about what should be done in event of her death, and dies within months under suspicious circumstances including the presence of a suicide note and other witnesses corroborating her depression and suicidal ideation, we do not believe uncertainty over the exact date of the suicide threats should preclude admission of those statements to show state of mind.[19]

The totality of the circumstances convinces us that Engstrom's testimony was relevant, admissible hearsay under the state of mind exception for another reason. Elizabeth was dependent on him for money. Five hours before she died, after a quarter of a century of responding to her demands, Engstrom told Elizabeth he would not give her any

18. The government also maintains that Engstrom's testimony is irrelevant because Engstrom stated that Elizabeth did not sound despondent, and he believed he would hear from her again despite refusing to send any more money. The issue here is not Engstrom's interpretations of the call, but Elizabeth's state of mind as reflected by her declarations to Engstrom.

19. Though this Circuit has not previously analyzed the time continuity issue as such, we have previously seen and allowed without commentary state of mind evidence derived from statements made months before the event occurred with which a relationship was suggested. See United States v. West, 898 F.2d 1493, 1497–98 (11th Cir.1990) (Defendant was not permitted to testify about conversations he had with an undercover FBI agent some four to five months before completion of the acts leading to indictment; this

Court suggested that the "district court may have incorrectly characterized [defendant's] version of [the agent's] statements as inadmissible hearsay."), cert. denied, 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 676 (1991); Wilmington Trust Co. v. Manufacturers Life Ins. Co., 749 F.2d 694, 698–99 (11th Cir.1985) (Insurer argued that decedent, who died from gunshot wounds in 1976, committed suicide. The court admitted state of mind testimony from decedent's friend, who testified that in October, 1975, while on a hunting trip, decedent talked about suicide. The court did not discuss the gap in time between the statements and death.). See also Harrigan v. New England Mutual Life Ins. Co., 693 F.Supp. 1531, 1532 (S.D.N.Y.1988) (doctor's letter, written in 1988, asserting that plaintiff complained of headaches in 1985 was admissible hearsay under Rule 803(3)).

more money.[20] Engstrom was asked how Elizabeth responded. He answered:

> She said, "Well, I'm all washed up then," or some words to that effect. She couldn't—she had to have money to go, continue operation.

The extent of Elizabeth's financial dependence on Engstrom figured prominently in her mental state on January 7th. We hold that Engstrom's deposition was relevant, admissible state of mind evidence because it contained not merely references to suicide, but information pertinent to decedent's desperate mental condition regarding finances on the date of her death.

■ However, our inquiry is not over. The trial court ruled that the testimony was cumulative and collateral. Defendants argue that exclusion of crucial, relevant, admissible evidence violated their constitutional right to present a defense. *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987). The Engstrom deposition, they say, provided Elizabeth's motive for self-destruction. The government's response rests on *United States v. Anderson*, 872 F.2d 1508 (11th Cir.1989), *cert. denied*, 493 U.S. 1004, 110 S.Ct. 566, 107 L.Ed.2d 560 (1989). In *Anderson*, the Court instructed that the right to present a defense is subject to compliance with the rules of evidence. *Id.* at 1519. Because we hold that Engstrom's deposition contained state of mind evidence admissible under Rule 803(3), the rule extracted from *Anderson* does not influence our consideration.

We move, then, to a brief review of admitted testimony to determine if Engstrom's deposition was, in fact, cumulative or collateral. Elizabeth's relationship with Engstrom figured prominently in the conclusions of the defenses' addictionologist. The expert testified that Engstrom's cutting off of funds that Elizabeth could use to buy drugs was the "major precipitating event" in her suicide. Nonetheless, his only direct reference to Engstrom was as follows:

Q. [ ] Did you find precipitating events in the case of Elizabeth Veltmann that would lead to suicide?

A. Rejection by Mr. Ingstrom [sic] and his—the apparent finality of this, you are getting no more money. That's got to be perceived by her as an enormous threat because, how am I going to pay for these drugs? . . . . R.16–53.

We cannot find, nor has counsel brought to our attention any other references to Engstrom in testimony or evidence heard by the jury.

"Although the trial court has discretion to exclude testimony and will not be reversed absent an abuse of discretion, the trial court's discretion does not extend to exclusion of crucial relevant evidence." *United States v. Ethridge*, 948 F.2d 1215, 1218 (11th Cir.1991) (citation omitted). Although a number of witnesses talked about Elizabeth's depression, threat to destroy her house, drug addiction, and financial straits, no witness brought to the jury that aspect of decedent's financial desperation arising from the end of a successful, long-term, blackmail. We find that exclusion of this evidence impaired defendants' right to fully present their defense, requiring reversal and remand for new trial.

### B. Prior Fires Evidence

Over defendants' objections to the admission of any references to prior fires, the jury learned of two previous fires (one in the early 1970's and one in 1985) on Veltmann-owned property. This evidence came in through 1) a firefighter's testimony, 2) audiotapes of defendants' interviews with an investigator for one of the insurers, 3) the audiotape of Chris' interview with a police sergeant, 4) the police sergeant's testimony, and 5) excerpts from Carl's deposition in a civil case against insurers arising from this fire. Defendants believed the government would introduce evidence of these fires pursuant to Rule 404(b).[21] Defendants objected at a hearing

---

**20.** Engstrom did testify that he had refused Elizabeth before, but agreed that he was cutting her off in no uncertain terms in the January 7th call.

**21.** The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, oppor-

on December 16, 1991, and filed pretrial motions arguing that the fires were remote, dissimilar, extrinsic acts introduced solely to show propensity to commit arson. Ruling on their motions was deferred to the trial judge.

At trial, defendants objected on the basis of Rule 404(b) each time the fires were mentioned. The court sustained the objection to the firefighter's testimony, but overruled each subsequent objection. At no time prior to the introduction of Carl's civil deposition did the government argue for admissibility under Fed.R.Evid. 801(d)(2). The district court agreed that the civil deposition was admissible as an admission. We affirm in part and reverse in part. Each source of prior fire evidence is discussed separately; rationale supporting their inadmissibility necessarily overlaps to some degree.

### 1. The Firefighter's Reference to the 1985 fire:

A firefighter was asked if he was familiar with the layout of the Veltmann house prior

tunity, intent, preparation, plan, knowledge, identity, or absence of mistake.... Fed. R.Evid. 404(b).

22. At the conclusion of this testimony, Chris' motion for mistrial or for a limiting instruction was denied. The following sidebar resulted:

Mr. Dannheisser: Your Honor, we discussed, the—we have an objection to any 404B evidence. The government appears to have specifically asked the witness the question to allow him to try to get into this fire next-door. I'm asking the Court to either grant a mistrial or to give a jury instruction that there's no evidence in this trial that any other fire is related to this. They specifically stated they weren't going to get into it until you ruled on it, and they specifically did it.

The Court: The motion is denied. They didn't get into anything. They just mentioned that he was there before and he asked him how and he told how. And then when you made the objection it was let out. There was not testimony at all with regard to that fire. R.10–52.

The denial of Chris' motions is not at issue in this appeal. This interaction is included to demonstrate that from the beginning of the trial, defense counsel and the Judge focused exclusively on Rule 404(b).

23. During the playing of Chris' interview, the following colloquy took place at side bar:

Mr. Hanlon: Judge, we just got into one of the 404B's that they started a fire 20 years ago. And my motion is to exclude it. The federal ten-year timeliness on a past conviction bars—

to responding to the fire. He answered, "Yes. Years earlier we had a fire next-door to theirs." Defense counsel's objection was sustained, apparently based on rule 404(b).[22]

### 2. Defendants' Statements to the Insurance Investigator:

An investigator working on behalf of one of the insurers inspected the Veltmann home on January 10th, and on January 11th conducted tape recorded interviews with Carl and Chris. The recordings were played for the jury. Chris answered the question "Have your parents ever had a fire in any property that they've owned in the past?" by discussing a fire in the 1970's to a vacant house owned by the Veltmanns. Chris believed that fire was caused by a lightning strike. Appropriate objections based on Rule 404(b) were made during the playing of Chris' tape.[23]

Carl's statement to the investigator was also played to the jury over objection.[24] Carl

The Court: There's nothing here that says anything about a conviction.

Mr. Hanlon: No. They weren't. That's just it. He's not trying to get in they've had four other fires, most of them are 20 years old. Some of them may have even won civil judgments in. I'm sure, I'm guessing, but I'm sure the argument's going to be how can you have five fires and not be a fire bug.

The Court: Counselor, we're here for the purpose of getting at the truth, and if these fires occurred and this son, Mr. Veltmann, Carl Veltmann is making these statements, we're entitled to hear it, the jury's entitled to hear it. Whether or not they were set by him, I'm not going to let anybody put anything in as to how they were set unless he was convicted and took the stand. If he didn't take the stand, you're not going to go into it at all. But the fact that they occurred, they occurred. It doesn't mean that they occurred criminally or somebody set them. R.11–135–136.

At the conclusion of the tape, the court approved Chris' attorney's request for adoption of the prior side bar.

24. Another sidebar ensued:

Mr. Hanlon: Judge, this is about the third fire Mr. Ruddy has brought out through the statement.

The Court: It's the same fire as the first one in his first tape.

Mr. Hanlon: I don't believe it is, Judge.

The Court: Maple Park, Illinois.

Mr. Hanlon: Well, there's a confusion between Maple Park hence and staying in that area.

responded to a question about previous fires by first discussing the 1985 fire at the cottage next-door to the current Veltmann residence. Chris apparently owned the cottage in trust provided by his parents. There was no known origin for the fire; Carl inferred that the origin may have been electrical. The insurance policy paid $40,000.

Carl next described the fire which occurred in a vacant house in Illinois (the same one mentioned by Chris), which took place in the early 1970's. Carl related that fire investigators told him that fire was set, perhaps by transients.[25]

### 3. Chris Veltmann's Statements to the Police Sergeant:

On January 8, Chris was interviewed by a police sergeant. The audiotape of the interview was played for the jury.[26] Chris was questioned about any enemies of his parents who might have had a motive to set the fire; in response, Chris mentioned the 1985 next-door fire, and said the tenant believed it was started by his parents.

### 4. The Police Sergeant's Testimony:

On January 9th, after being advised of his Constitutional rights under *Miranda*, Carl

was interviewed by the sergeant. The tape of this interview was not introduced into evidence at trial. When asked if he knew of anyone with a motive to set the fire, Carl discussed the 1985 next-door fire. The sergeant then testified over objection[27] that he disagreed with Carl's assessment that the 1985 next-door fire was caused by electrical problems, but stated that determination of the cause was never made.

### 5. Carl Veltmann's Civil Suit Deposition.

Just prior to his indictment, Carl Veltmann gave a deposition in a bad-faith insurance suit he initiated against insurers regarding payment of claims arising out of the January 7th fire. Portions of his deposition testimony were read into evidence over defendants' objections.[28] At this point, the government suggested that Carl's deposition was admissible under Fed.R.Evid. 801(d)(2), as an admission. During a lengthy sidebar, Carl's counsel urged, to no avail, that rule 801(d)(2) was being used to sidestep analysis under Rules 404(b) and 403. The court determined that rule 404(b) was inapplicable, and allowed portions of the deposition to be read to the jury. Rule 403 balancing was never conducted.

---

There was more than one fire there, and that's what the problem is here. We're dealing with five fires that are collateral in nature. I understand about 404(b), but it's starting to become a feature. They are not offering to prove identity, motive, any of the other things, only the fact that these people had this many other fires.

The Court: I'm allowing this in. This is the tape that's being played and the tape is in evidence. What's on the tape is in. As far as the testimony comes from this witness and the opinion testimony or anything else, I'll rule on it when the time comes.

Mr. Dannheisser: While we're up here, can I— would I assume the Court is acknowledging that we have objections to any prior fires or discussions so we don't have to keep coming up here?

The Court: Yeah. R.11–142–144.

**25.** In their brief, defendants claim this tape contained references to fires in 1963, 1972, and 1985. Appellants' brief at 42, n. 30. We are unable to confirm that the tape contained references to three separate fires.

**26.** Defendants' continuing objection from the colloquy about Buckley's testimony was in effect.

**27.** The following colloquy took place at side-bar:

Mr. Hanlon: Judge, now the facts of the 404(b) that I filed a motion to keep out that hadn't been ruled on yet. Whatever my client talks about or not, he didn't own the property, and now to try to make it look like he lied about it again, they are trying to convict him in this fire because of other fires. And it's getting to be more than—its not for identity, motive, opportunity. It's none of that. It's only to convict him of this case based upon his propensity to commit crimes in other cases, i.e. other fires.

The Court: Your objection's overruled. This is an interview that was made by him in connection with an investigation of this fire, and he has a right to testify as to what testimony or what the man stated to him at the time when he was questioning him, and your objection is overruled, and your exception is noted.... Mr. Dannheisser's exception is noted also. R.12–68–69.

**28.** Chris was also deposed by the insurers. The court agreed that Carl's testimony could not be used against Chris, and that Chris' deposition could not be used at all because Chris was unrepresented by counsel during his deposition. In accord with Chris' request, a limiting instruction was given regarding use of Carl's deposition against him.

In his deposition, Carl responded to a question regarding his "theory of what took place" by stating that a former housekeeper might be responsible for the Veltmann house fire because she had both access and possible motivation. Her motivation related to the 1985 fire; she was a tenant in the cottage that was destroyed, and told fire investigators that the Veltmanns were responsible.[29]

### The Applicability of Rule 404(b):

Because all of the previous fire evidence except the civil deposition was admitted over Rule 404(b) objections, we begin with that rule. Evidence of extrinsic offenses is inadmissible to prove that the accused has the propensity to commit the crime charged. Fed.R.Evid. 404(a). Nonetheless, extrinsic act evidence is admissible under Rule 404(b) as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed.R.Evid. 404(b).

The government maintains on appeal that the statements about prior fires were admissible not as 404(b) evidence, but as statements made in furtherance of the present crime. Evidence of criminal activity other than the offense charged is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense. *United States v. Weeks,* 716 F.2d 830, 832 (11th Cir.1983) (citations omitted). *See also United States v. Leavitt,* 878 F.2d 1329, 1339 (11th Cir.), *cert. denied sub nom., Garces v. United States,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *United States v. Meester,* 762 F.2d 867, 877 (11th Cir.), *cert. denied sub nom., Sawyer v. United States,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985).

Unquestionably, the fires set in the 1970's and 1985 did not arise out of the same transaction or series of transactions as the charged offense. Defendants are charged solely with setting fire to the Veltmann

home, not to decades of conspiracy to defraud insurers. Nor is evidence of the previous fires necessary to complete the story of this crime. There is nothing linking the previous and present fires; no thread of evidence extends from the 1970's to the night of January 7, 1990, when the Veltmann home was destroyed. The more difficult issue is whether the defendants' suggestion that their tenant in the 1985 next-door fire was a possible suspect in this crime inextricably intertwines the two fires.

When the police sergeant asked Chris and Carl if they knew of anyone with a motive to set Veltmann home fire both responded by bringing up the 1985 fire and the disgruntled former housekeeper who was their tenant. Thus, facts surrounding the 1985 fire became linked with the present offense. By directing the investigation toward the housekeeper, defendants could have been engaging in activity in furtherance of the charged offense; to wit, naming another suspect in an attempt to exculpate themselves. We find that Chris' taped statement to the police, and the sergeant's testimony about the 1985 fire were inextricably intertwined with evidence of the charged offense, made in furtherance of the crime charged, and properly admitted into evidence.

In contrast, defendants' statements to the insurance investigator were made in response to questioning about "any previous fires on property owned by the Veltmanns." This inquiry springs from an altogether different well. The question did not direct defendants to the present fire at all; specifically, they were asked to focus on *previous* events. By its nature, this question does not give rise to an answer invoking furtherance of the charged offense. We find that the statements made to the insurance investigator were not made in furtherance of the charged offenses, and proceed with Rule 404(b) analysis of those statements.

In *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59

---

**29.** Despite defendants' assertion that the deposition contained references to two fires in Illinois and one in Kansas, the record shows that portions read to the jury concerned the 1985 next-door fire exclusively.

L.Ed.2d 472 (1979), the court described a two-step test required for admission of 404(b) evidence. The court must first assure that the evidence is relevant to an issue other than defendant's character and then be persuaded that the evidence's probative value is not substantially outweighed by its undue prejudice. *Beechum*, 582 F.2d at 911. Extrinsic act evidence should be admitted only if both prongs of the test are satisfied.

Nothing on this record reflects that the district court conducted the *Beechum* analysis. It appears that defense counsel was never fully heard on its 404(b) pretrial motion, although the rule was mentioned in each quoted sidebar.[30] Accordingly, our inquiry proceeds with the relevance prong under *Beechum*.

For extrinsic offenses to be relevant to an issue other than character, they must be shown to be *offenses*, and must also be *similar* to the charged offense. *United States v. Guerrero*, 650 F.2d 728, 733 (5th Cir.1981). *See Beechum*, 582 F.2d at 912 ("Obviously, the line of reasoning that deems an extrinsic offense relevant ... is valid only if an offense was in fact committed and the defendant in fact committed it."). Proof that defendants committed other relevant offenses prior to the charged act must be sufficient to permit a jury, acting reasonably, to find the preliminary facts by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).

To meet the threshold requirement for relevancy of the statements to the insurance investigator, the government had to demonstrate that (1) Carl or Chris Veltmann committed arson in the 1970's Illinois fire and 1985 next-door fire, and (2) the fires were similar to that set in the Veltmann home. There is nothing in the record showing by a preponderance of the evidence that

either defendant set the previous fires. At most, the evidence suggests that the Illinois fire was possibly set by transients, and that the next-door fire had an undetermined cause. Because the genesis of these fires is unknown, no assertion can be made that the fires were similar. Indeed, the only parallel between the three fires is that they were on property owned by the Veltmanns. Neither defendant was charged with arson before this incident. Carl's recovery of $40,000 in insurance proceeds for the 1985 fire is surely not proof by a preponderance of the evidence that he committed arson. There is not even a scintilla of evidence implicating Chris as an arsonist in either previous fire. Accordingly, we find that defendants' statements to the insurance investigator about both the 1970's and 1985 fires failed to meet the threshold level of relevance for admissibility under Rule 404(b). We need not, therefore, engage in Rule 403 balancing[31] or assess whether the fires were relevant to some issue other than propensity.

### The Applicability of Rule 801(d)(2):

Rule 801 was not brought up until sidebar discussion about admission of Carl's civil deposition. The government argued that the deposition was admissible under subsections 801(d)(2)(A) or (E), which provide that a statement is not hearsay if:

> The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Fed.R.Evid. 801(d)(2).

Because it appears that the trial court admitted the civil deposition as an admission for use against Carl alone, we begin with that part of the rule. Statements made

---

**30.** Interestingly, the government never suggested how it believed Rule 404(b) might apply.

**31.** We note, nonetheless, that this evidence clearly presents a high risk of unfair prejudice. *See United States v. Anderson*, 933 F.2d 1261, 1272 (5th Cir.1991); *United States v. Neary*, 733 F.2d 210, 217 (2d Cir.1984). Carl and Chris were convicted solely on circumstantial evidence.

Without more linking them to the present fire and the repeated testimony about previous fires with unknown causes on Veltmann property, there is a significant danger that "the jury may feel that the defendant[s] should be punished for [the previous fires] even if [they are] not guilty of the offense charged." *Beechum*, 582 F.2d at 914 (citations omitted).

in a civil deposition arising out of the same facts as a criminal prosecution are admissible as admissions when offered against the declarant. *United States v. Jenkins,* 785 F.2d 1387, 1393 (9th Cir.1986), *cert. denied sub nom., Prock v. United States,* 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 125 (1986), *and cert. denied sub nom., White v. United States,* 479 U.S. 889, 107 S.Ct. 288, 93 L.Ed.2d 262 (1986). Unquestionably, the deposition at issue was given in proceedings arising from the fire at the Veltmann home on January 7th. Although the trial court correctly held that the deposition contained admissions which were admissible under rule 801(d)(2)(A), it apparently failed to conduct a Rule 403 analysis as required in this circumstance. *United States v. Killough,* 848 F.2d 1523, 1528 (11th Cir.1988); *United States v. Sawyer,* 799 F.2d 1494, 1506 (11th Cir.1986), *cert. denied sub nom., Leavitt v. United States,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987). The exclusion of relevant evidence under Rule 403 is an extraordinary remedy which "should be applied sparingly." *United States v. Cole,* 755 F.2d 748, 766 (11th Cir.1985). The "major function [of Rule 403] is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979).

■ We must determine if those portions of the civil deposition pertaining to the 1985 next-door fire were "dragged in by the heels" solely for prejudicial impact. Carl mentioned the fire in response to the insurer's query about his "theory of what happened." This is a similar inquiry to that undertaken by the police sergeant, *supra,* leading the deponent directly to explanation of circumstances surrounding the charged crime. Indeed, Carl's response closely tracked that given to the sergeant when he asked if anyone had a motive to set the fire. We find the query legitimate and its answer admissible. As with the sergeant's testimony, Carl's deposition answers are undoubtedly prejudicial, but not so *unfairly* prejudicial as to warrant exclusion. Accordingly, we affirm the trial court's ruling on admissibility of those por-

tions of Carl Veltmann's civil deposition that were read to the jury.

### C. The Bruton Violation:

Carl Veltmann maintains that pursuant to *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), his Sixth Amendment right to Confrontation was violated when David Meehan, Chris' cellmate, was permitted to testify about statements Chris made to him that directly inculpated Carl. Chris did not testify, thereby robbing Carl of the opportunity to cross-examine him as to Meehan's allegations. The government apparently concedes that a *Bruton* violation occurred, but responds that the cumulative admissible evidence of guilt was so overwhelming, and Chris' comments so insignificant by comparison, that admission of Meehan's testimony was harmless error. We do not agree that the error was harmless, and reverse.

■ In *Bruton,* the Supreme Court held that the admission of a statement made by a non-testifying defendant which inculpates a co-defendant violates the co-defendant's right to confront a witness. Only those statements by a non-testifying defendant which directly inculpate a co-defendant give rise to the constitutional violation. *United States v. Arias,* 984 F.2d 1139, 1142 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2979, 125 L.Ed.2d 676 (1993), *and cert. denied,* —— U.S. ——, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993), *citing United States v. Beale,* 921 F.2d 1412, 1425 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 100, 116 L.Ed.2d 71 (1991). *Bruton* violations are subject to harmless error analysis. *Beale,* 921 F.2d at 1425; *United States v. Petit,* 841 F.2d 1546, 1556 (11th Cir.1988), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988). "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972).

David Meehan's testimony directly inculpated Carl. According to Meehan, Chris stated that his father started the fire in the foyer with paper and lighter fluid, took the tops off all the batteries, and left the home after seeing the wallpaper [32] catch fire. Meehan also testified that Chris told him that Carl flew to Montana, in contradiction to all other evidence about Carl's trip. It is difficult to imagine how a defendant might be more prejudiced by the testimony of a witness about what a co-defendant allegedly said when precluded from cross-examining the declarant due to declarant's decision not to testify. This is precisely the predicament giving rise to the rule. Accordingly, we have no difficulty agreeing with Carl's contention that a *Bruton* violation took place.

We find the government's argument that the error was harmless without merit. The entire case against Carl was circumstantial. Stripped of the erroneously admitted previous fire evidence, the government's case rests on disputed evidence about the condition of the smoke detectors and alarm, estimates of burn time relative to Carl's departure from the house, testimony of an "alibi" witness that he was not anticipating a visit from Carl, allegations of Carl's cellmate about Carl's admissions that were at least partially without factual accuracy,[33] Carl's suggestion that an acquaintance could burn down his own property, investigators' skepticism about Carl's emotional reactions, and the happenstance of a previous fire of unknown origin at the cottage owned by the Veltmanns. The government urges that Carl's testimony was inherently incredible and constituted positive evidence in favor of the government. It points to Carl's theory, given in the civil deposition, that someone burglarized the residence and committed arson to cover up the crime. This position is admittedly contrary to the suicide defense proffered at trial. We will not attempt to plunder the depths of Carl's psyche to determine why he might have suggested burglary to the insurers. We have no difficulty deciding that the suicide defense was not only plausible, but was supported by credible evidence.

In this case, the properly admitted evidence of guilt is less than overwhelming, and the prejudicial effect of the codefendant's statements is so significant in comparison, that it is clear that admission constituted harmful error. David Meehan's testimony of Chris' statements about Carl, given Chris' decision not to testify, deprived Carl of this Sixth Amendment right to confront witnesses against him, and constituted prejudicial error necessitating reversal and remand for a new trial.

In summary, we hold as follows on defendants' claims of evidentiary error: (1) we reverse the trial court's exclusion of Carl Engstrom's video deposition; it was admissible as state of mind evidence under Rule 803(3); (2) we affirm the trial court's admission of Chris' statement to the police sergeant and the sergeant's testimony about the 1985 fire; (3) we reverse the admission of defendants' statements to the insurance investigator; they were not made in furtherance of the crime, comprised improper character evidence, and did not come within Rule 404(b); (4) we affirm the trial court's admission of portions of Carl's civil deposition pertaining to the 1985 fire; the statements were an admission under Rule 801(d)(2)(A) that were not unfairly prejudicial pursuant to Rule 403 analysis; (5) we find that David Meehan's testimony constituted a *Bruton* violation that was not harmless error, requiring reversal.

## CONCLUSION

For all of the foregoing reasons we AFFIRM the trial court rulings in part, but REVERSE and REMAND for new trial based on evidentiary errors.

---

**32.** Meehan said the wallpaper was felt. It was actually made of silk.

**33.** Terry Price testified that Carl told him he left for Montana the day *before* the fire.