United States Court of Appeals,

Eleventh Circuit.

No. 95-2346.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

Forrest Jimmy UTTER, Jr., a/k/a Biff, Defendant-Appellant, Cross-Appellee.

Oct. 16, 1996.

Appeals from the United States District Court for the Middle District of Florida. (No. 94-87-CR-ORL-22), Anne C. Conway, District Judge.

Before COX and BARKETT, Circuit Judges, and BRIGHT[*], Senior Circuit Judge.

BRIGHT, Senior Circuit Judge:

A jury convicted Forrest J. Utter of conspiracy, mail fraud, arson, and using fire to commit a federal felony offense. The district court sentenced him to fifteen years imprisonment. Utter appeals, arguing that (1) the evidence was insufficient to support the convictions, (2) the district court abused its discretion by allowing the introduction of "extrinsic acts" evidence, (3) the imposition of a consecutive five-year sentence for use of a fire to commit conspiracy and arson violated double jeopardy, and (4) the government failed to establish the requisite nexus to interstate commerce. The government cross-appeals claiming sentencing error. Although the evidence presented by the government was thin, we conclude that it was sufficient to support the convictions and that the evidence established a substantial nexus with interstate

[*]Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

commerce.  We determine, however, that the district court abused its discretion by allowing the introduction of certain extrinsic evidence as "other crimes" evidence and remand the case for a new trial.  Thus, we do not reach Utter's double jeopardy claim or the government's cross appeal.

## I. BACKGROUND

In the early morning hours of September 2, 1991, fire completely destroyed Stormy's Seafood Restaurant (Stormy's) in New Smyrna Beach, Florida.  Two firefighters, Doug Sapp and Mark Wilkes, were tragically killed as they attempted to fight the fire. The two firefighters were endeavoring to locate the source of the fire when they were overcome by smoke.  On June 23, 1994, a federal grand jury indicted Utter on charges ensuing from the Stormy's fire.

In May of 1988, Utter and his wife, Susan, purchased Stormy's from Marion Yelvington.  Yelvington retained a mortgage on the property.  Although the property was deeded in Susan's name, Utter himself completely controlled the business.  Prior to purchasing the restaurant, Utter had resided in Kentucky where he worked in the coal mining business.  Although Utter and his wife divorced later in 1988, the divorce did not appear to effect the control or operation of the restaurant.

Within a year of purchasing Stormy's, Utter fell behind on the mortgage payments. Utter often made his payments late or requested Yelvington to hold the checks for a period of time before cashing them.   Some  checks  were  returned  for  insufficient  funds. Yelvington's son, Conway, began assisting her efforts to obtain

payments on the mortgage.  Utter failed to pay property taxes on the restaurant, and Yelvington was forced to pay the taxes.

Utter also failed to pay the premiums owed his insurance carrier, and the restaurant's fire insurance lapsed.  In April of 1991, Utter went to Jennings Insurance Agency, where he had previously obtained insurance on the property, and completed a new insurance application.  Although the application requested information concerning "all claims or occurrences that may give rise to claims for the prior 5 years," Utter did not disclose that he had submitted a claim involving a 1988 fire which destroyed a house in Kentucky owned by Utter and his wife.  Although the application was apparently approved, Utter never actually obtained insurance as he was unable to pay the premium on the policy.

In June of 1991, Conway Yelvington learned that the fire insurance on Stormy's had lapsed.  Yelvington promptly purchased approximately $400,000 worth of fire insurance on the restaurant. Jennings later notified Utter that Yelvington had obtained insurance on the restaurant.  On August 8, 1991, Yelvington served papers on Utter indicating his intention to foreclose on the property.  Stormy's was destroyed by fire on September 2.

At trial, the government produced significant evidence of Stormy's poor financial condition.  The evidence was intended to establish a motive for the alleged arson.  As described above, the government presented evidence that Utter failed to keep current on the restaurant's mortgage, insurance and tax payments.  The government also established that (1) the restaurant's sales and payroll taxes were behind in payment, (2) the restaurant's liquor

license was in danger of being revoked for failure to pay the surcharge tax on alcohol sales, and (3) a substantial number of insufficient checks were drawn on Stormy's account.

The government also introduced evidence leading to the conclusion that the fire was an "inside job." First, although none of the employees smelled smoke or any flammable liquid or other odor while in the restaurant that night, the fire was in full blaze less than 30 minutes after the restaurant closed. Secondly, the government produced indirect evidence that Utter's mother, who worked at the restaurant, may have failed to set the building's alarm system that evening. In any event, the alarm failed to sound. Finally, although the expert witnesses presented by the prosecution did not conclusively state that the fire was an arson, they indicated that the fire was a "hot, high, fast fire, not indicative of an accidental or other type fire," and that the fire was "incendiary in nature." (Tr. at 1098). A forensic chemist examined a piece of ceiling insulation in the area where the fire was believed to have originated and found a petroleum distillate on the insulation.

Finally, the prosecution presented evidence of "threats" made by Utter to burn the restaurant. A former employee at the restaurant stated that she once heard Utter tell his brother that he would burn the restaurant before anyone took it from him. Lisa Jernigan, who was living with Utter prior to the fire, testified that she had heard him state that he would burn the restaurant rather than let Yelvington foreclose. Michael Herron, a long-time friend of Utter's, testified that Utter had stated that a small

fire at the restaurant might be good because it would provide funds for remodeling. Both Jernigan and Herron, however, indicated that they thought the comments were "off-the-cuff" and not serious. The government also offered evidence that two years after the Stormy's fire, Utter threatened to "burn out" a tenant unless the tenant vacated within thirty days, and that a 1988 fire destroyed Utter's home in Kentucky while the home was in foreclosure.

The jury convicted Utter of conspiracy to commit mail fraud and arson in violation of 18 U.S.C. § 371, mail fraud in violation of 18 U.S.C. § 1341, arson in violation of 18 U.S.C. 844(i), and using a fire to commit federal felony offenses in violation of 18 U.S.C. § 844(h). The court sentenced Utter to fifteen years imprisonment.

## II. DISCUSSION

### A. Sufficiency of the Evidence

In challenges to the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the government and considers whether a reasonable jury could find the defendant's guilt beyond a reasonable doubt. *United States v. Green,* 40 F.3d 1167, 1173 (11th Cir.1994), *cert. denied,* --- U.S. ----, ----, 115 S.Ct. 1809, 2262, 131 L.Ed.2d 733, 132 L.Ed.2d 268 (1995). In judging the sufficiency of the evidence, the standard applied is the same whether the evidence is direct or circumstantial. *United States v. Mieres-Borges,* 919 F.2d 652, 656-57 (11th Cir.1990), *cert. denied,* 499 U.S. 980, 111 S.Ct. 1633, 113 L.Ed.2d 728 (1991). Proof may be established through circumstantial evidence or from inferences drawn from the conduct of an individual. *Green,* 40 F.3d

at 1173.

The government concedes that the evidence against Utter is entirely circumstantial. Although this is a close case, we conclude that the government presented sufficient evidence to support the convictions. First, the government offered substantial evidence that the restaurant was having financial difficulties and was in foreclosure at the time of the fire. Thus, the jury could conclude that Utter had a motive to commit arson. Second, the fire examiners testified that, for a number of reasons, the fire was consistent with arson and inconsistent with an accidental fire.[1] The government also presented evidence that Utter had talked about burning the restaurant on a few occasions prior to the fire. In connection with the mail fraud charge, the government established that Utter caused a proof of loss to be mailed to the insurance company in which he stated that he did not cause the fire. Once the jury determined that Utter committed the arson, it could conclude that Utter's claim was fraudulent. Because we reverse and remand for a new trial based on evidentiary error, the sufficiency of the evidence claims require no further analysis. *See United States v. Veltmann,* 6 F.3d 1483, 1491 (11th Cir.1993).

### B. Introduction of Extrinsic Evidence

Utter challenges the introduction of certain extrinsic evidence. First, the prosecution introduced evidence that

---

[1]The facts testified to by the fire examiners which indicated arson included: (1) the fire moved at a very rapid rate, (2) the fire moved along the ceiling, and arsonists commonly set fire to the ceiling of a building to ensure a total loss for insurance claims, (3) electrical failure or gas leaks or malfunction were ruled out, and (4) a flammable substance was found in the ceiling insulation.

approximately two years after the fire at Stormy's, Utter engaged in a dispute with an individual who rented residential property from him and threatened to burn the individual's belongings if she did not vacate his property. Secondly, the prosecution presented evidence that a fire had destroyed Utter's home in Williamsburg, Kentucky, approximately three years prior to the Stormy's fire. The Kentucky home was in foreclosure at the time of the fire. Finally, Utter challenges the introduction of evidence concerning a letter to a mortgage company which indicated that a gift of $82,500 was being made to Utter's mother from his ex-wife Susan.

Because the district court admitted all the evidence over Fed.R.Evid. 404 objections, we begin our discussion with that rule. Subject to specific exceptions, Rule 404(b) provides that extrinsic evidence is not admissible to prove defendant's character in order to show action in conformity therewith.[2] In *United States v. Miller,* 959 F.2d 1535, 1538 (11th Cir.) (en banc), *cert. denied,* 506 U.S. 942, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992), this court laid out a three-part test for evaluating the admissibility of Rule 404(b) evidence:

---

[2]Rule 404(b) provides in full:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of [Federal Rule of Evidence] 403.

*Id.* (citations omitted). Rule 404(b) extends only to "extrinsic" evidence. "Bad acts" evidence is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense. *Veltmann,* 6 F.3d at 1498. "Evidentiary rulings challenged on appeal will not be overturned absent clear abuse of discretion." *Id.* at 1491.

### (1) *Testimony of Susan Bosiger*

Susan Bosiger rented a cottage from Utter in 1993-94. At trial, Bosiger testified that the cottage was supposed to have heat and air conditioning included in the rent. In February of 1994, Bosiger's air conditioning was not working so she contacted a repair service to have it repaired. She then deducted the $90 she paid for the repairs from her monthly rent check and sent in the remainder of the rent with the receipt for the repairs. Bosiger testified that when Utter received the partial payment he was "upset" and demanded complete payment. Bosiger testified that Utter stated that if she did not get her things off his property within thirty days, he would "burn her out." Utter's counsel objected to the testimony prior to trial and again during the trial itself.

Bosiger's testimony surrounding Utter's threat to "burn her out," was completely irrelevant to any issue at trial: It sought only to show Utter's alleged propensity to commit arson. Utter's statement occurred over two years after the fire at Stormy's. The threats did not relate to any arson to collect insurance, as was charged concerning the Stormy's fire, but rather only to a threat to use fire. On appeal, the government argues that the evidence is relevant because it "demonstrate[s] how the defendant reacts to financial stress." (Appellee's Brief at 36). This is the type of character and propensity evidence prohibited by Rule 404(b). The evidence thus fails the first part of the test for the admission of Rule 404(b), for the evidence related only to Utter's "bad character" and was not relevant to an issue at trial. The district court abused its discretion in allowing the testimony.

### (2) *The Kentucky Fire*

In its pretrial notice of intent to introduce Rule 404(b) evidence, the government indicated that it would present evidence that the fire at Utter's Williamsburg, Kentucky, home was the result of arson. The government indicated that the fire began under suspicious circumstances. The government also stated that Utter's girlfriend, Lisa Jernigan, would testify that she saw Utter give money to an unknown man and that Utter later told her that he had paid the man to burn his home in Kentucky.

Just prior to trial, the government also argued that evidence that the fire had occurred should be admissible as "inextricably intertwined" with one of the overt acts charged in the conspiracy count. The government argued that Utter failed to disclose on the

Jennings Insurance Agency commercial insurance application that his residence in Williamsburg, Kentucky, had been destroyed by fire in 1988. The Jennings Insurance Agency application requested information concerning "all claims or occurrences that may give rise to claims for the prior 5 years." The government asserted that Utter did not list the Kentucky fire in his application because of fear that insurance carriers would deny him coverage and foil his plan to profit from the arson. The government thus asserted that it could present proof of the fire as evidence of the alleged fraudulent representation.

Neither of these contentions provides a basis for introducing evidence of the Kentucky fire before the jury. First, despite its assertions in the pretrial notice, the government failed to produce any evidence at trial which tended to prove that the Kentucky fire was an arson. In her testimony at trial, Jernigan indicated that she could not sufficiently recall Utter's statements concerning the fire. The government presented no other evidence concerning the cause of the fire. The government thus clearly failed the second part of the test for admissibility of Rule 404(b) evidence: No proof was presented that Utter committed the extrinsic act—arson in the Kentucky fire.

Second, the evidence of the Kentucky fire is so tangential to any conspiracy that "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The evidence revealed that the fire insurance lapsed on Stormy's due to Utter's failure to pay the premium. Thereafter, in April of 1991, Utter signed the application which failed to disclose the

prior fire at his Kentucky residence. Although the insurance agent used the application to obtain premium quotes, Utter never actually obtained any insurance because he could not afford to pay the premium. Thus the application containing the alleged misrepresentations did not result in any insurance on Stormy's. By declining insurance based upon his April application, Utter cannot be considered to have furthered any scheme of defrauding the insurance company. The policy under which Utter eventually filed a claim was independently obtained in June of 1991 by Conway Yelvington. Further, the prosecution's alleged reason for introducing the evidence, fear that the policy would be rejected, is completely speculative and without evidentiary foundation.

Accordingly, even if evidence of the Kentucky fire is considered "intrinsic" evidence of the alleged conspiracy, the district court abused its discretion in failing to exclude the evidence under Rule 403.[3] Although Rule 403 is an "extraordinary remedy," *Veltmann,* 6 F.3d at 1500, its major function of "excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect' ", *id.* (quoting *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)), is required here. *See United States v. Guerrero,* 650 F.2d 728, 735 (5th Cir.

---

[3]Fed.R.Evid. 403 provides in full:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Unit A July 1981).

The introduction of evidence concerning the Kentucky fire involved a high risk of prejudice. *See United States v. Anderson,* 933 F.2d 1261, 1272 (5th Cir.1991); *United States v. Neary,* 733 F.2d 210, 216-17 (2d Cir.1984). The evidence introduced about the Kentucky fire included: (1) Utter obtained fire insurance on the house; (2) the house was destroyed by fire while in foreclosure; and (3) Utter's girlfriend, Jernigan, saw Utter give money to an unknown man under suspicious circumstances. There is a real danger that, based upon this evidence, the jury may in part have based its conviction on a determination that Utter "uses fire to solve his problems," even though the government could not establish the Kentucky fire as an arson.

Given that this was an extremely close case built entirely upon circumstantial evidence, we cannot conclude that the district court's error in admitting evidence of the Kentucky fire and Utter's threat to burn out his tenant constitutes harmless error. *See Veltmann,* 6 F.3d at 1501; *Guerrero,* 650 F.2d at 736. Accordingly, we must reverse the trial court's rulings and remand for a new trial.

### (3) *The Gift Letter*

Finally, Utter argues that the district court should not have admitted a letter related to a mortgage company indicating that a gift of $82,500 was being made to Pauline Duncan, Utter's mother, from his ex-wife, Susan Utter. The gift letter was used in connection with the sale of the home in New Smyrna Beach in which Utter lived. Although Utter lived in the home, the property was in

Susan Utter's name.  In connection with the divorce, Susan Utter "sold" the property to Duncan.  The gift letter indicated that Susan Utter was giving the money for the sale to Duncan, and Duncan was not obligated to any repayment.  Utter continued to live in the home.

The government argued that the gift letter was evidence of Utter's financial problems.  It showed that although he continued to control the residence, he wanted to keep the property in another person's name.  The evidence also supported the government's contention that although Stormy's was held in Susan Utter's name, Utter himself completely controlled the business.  No evidence was introduced that the gift letter was illegal.

This extrinsic evidence is not infected with the same problems as the evidence surrounding Utter's threats to his tenant and the Kentucky fire.  The evidence of the gift letter is relevant to Utter's financial problems and thus relates in part to a motive to commit arson and then collect on an insurance policy.  *See Anderson,* 933 F.2d at 1274.  Furthermore, the evidence is not likely to inflame the jury, waste court time, or confuse the issues.  Accordingly, the district court did not abuse its discretion in admitting the evidence.

## C. Nexus to Interstate Commerce

Utter argues that the arson conviction is unconstitutional in light of the United States Supreme Court decision in *United States v. Lopez,* --- U.S. ----, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).  Utter does not contend that the federal arson statute itself is unconstitutional.  Instead, he asserts that the evidence in this

case failed to establish the jurisdictional prerequisite of the federal arson statute. The statute provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned ..., fined ..., or both.

18 U.S.C. § 844(i) (emphasis added). In *United States v. Denalli,* 73 F.3d 328, 329 (11th Cir.1996), this court reversed a conviction pursuant to the federal arson statute, holding that the evidence did not satisfy this jurisdictional prerequisite. *Denalli* involved the destruction of a private residence. *Id.* The parties conceded that the residence was not used in interstate or foreign commerce. The government, however, contended that the homeowner's occasional use of a personal computer in the house affected interstate commerce because the use concerned his work as an electrical engineer for a company that engaged in interstate and international business. *Id.* at 330-31. This court held that the evidence did not establish a substantial effect on interstate commerce.

In contrast to the situation in *Denalli,* this case involves the destruction of a public restaurant, i.e. one offering to serve interstate travelers. At trial, the government established that the restaurant served alcohol and used natural gas, both of which originated outside of Florida. Under these circumstances the requisite connection to interstate commerce is apparent. *See Katzenbach v. McClung,* 379 U.S. 294, 304, 85 S.Ct. 377, 384, 13 L.Ed.2d 290 (1964) (effect on commerce exists where restaurant offers to serve interstate travelers or serves food a substantial portion of which has moved in interstate commerce); *United States*

*v. Shockley,* 741 F.2d 1306, 1307 (11th Cir.1984) (per curiam) (concluding that restaurant retained its interstate character even when closed for repairs); *United States v. DiSanto,* 86 F.3d 1238, 1248 (1st Cir.1996) (determining restaurant which received food supplies and natural gas from outside state was property used in interstate commerce).

## III. CONCLUSION

Based upon the evidentiary errors discussed above, we reverse Utter's convictions as to all counts and remand for a new trial.

COX, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's opinion except for the holding that the district court's admission of evidence of the Kentucky fire and Utter's threat to burn out his tenant mandates a new trial.

The majority's conclusions about evidence of the Kentucky fire are based upon a misreading of the record. I find no abuse of discretion in the district court's rulings relative to evidence of the Kentucky fire. In any event neither this evidence nor the relatively inconsequential testimony of Utter's former tenant had a substantial influence on the outcome of this case.

Prior to trial the government filed written notice pursuant to Fed.R.Crim.P. 12(d)(1) of its intent to offer certain evidence, alleging that such evidence was extrinsic, but "inextricably intertwined", and also alleging that the evidence was admissible under Rule 404(b). Paragraph 4 of the government's pretrial notice contained a rather detailed proffer relating to evidence concerning the Kentucky fire. It reads as follows:

4. The government intends to offer evidence that on July 7, 1988, defendant Utter applied for insurance on his

residence located in Williamsburg, Kentucky, and signed the name of his wife, Susan Burtner, to the policy. At the time defendant Utter applied for this insurance policy numerous liens encumbered the residence, and defendant Utter was separated from his wife, Susan Burtner, and a divorce was pending. Shortly after an insurance policy was issued by Kentucky National Insurance Company, neighbors observed men removing the furnace, air conditioning system, and other appliances from defendant Utter's residence. On August 17, 1988, defendant Utter's residence in Williamsburg, Kentucky, was destroyed by fire. An inspection of the residence showed mattresses piled against the door and gasoline had been poured inside the dwelling. Employees of Stormy's Seafood Restaurant will testify that defendant Utter was out of town at the time of the fire.

A witness will testify that prior to the fire a man visited defendant Utter at his residence in New Smyrna Beach, and defendant Utter was observed handing the man a large sum of money. After the fire occurred, the witness asked defendant Utter about the man that had received the money, and defendant Utter stated words to the effect that he had paid the man to burn his home in Williamsburg, Kentucky. Defendant Utter later stated to the witness that the fire had been burned before the man could complete the job. As a result of the fire, the Kentucky National Insurance Company paid the policy limits of approximately $150,000, most of which was used in satisfying liens and judgments against defendant Utter which had encumbered the home. After the Stormy's Seafood Restaurant fire, defendant Utter instructed the witness not to mention to investigators his comments concerning paying to have his Williamsburg, Kentucky, home burned. Also, in depositions taken in connection with the Stormy's fire, defendant Utter disavows knowledge of the insurance coverage and payments regarding the Williamsburg, Kentucky, fire.

(R. 1-61 at 2-3.) Following the filing of this notice, Utter filed a motion in limine seeking an order prohibiting the government from introducing any extrinsic acts evidence unless proffered outside the presence of the jury and "only if such evidence meets the standards" of Rule 404(b). (R. 1-62.) The court held a "hearing" on the motion prior to trial, but no evidence relevant to the matter was received. Counsel simply argued the merits of the motion in limine. (R. 4-91 through 117.) Following the hearing

the court ruled that the government would be permitted to present evidence of the 1988 fire and the subsequent insurance claim, (R. 5-2), concluding that some of the evidence proffered was "relevant to the indictment" and that evidence of the arson in Kentucky would be admitted under Rule 404(b). (R. 5-6.) Later, when a stipulation evidencing the fact that Utter applied for insurance on the Kentucky home was offered, (R. 7-590), Utter's counsel again voiced an objection based upon Rules 403 and 404; the objection was implicitly overruled. (R. 7-590.) No further Rule 403 or Rule 404(b) objections to evidence of the Kentucky fire were voiced.

The government sought to prove by the testimony of Jernigan, Utter's live-in girlfriend, that Utter had paid someone to burn his Kentucky home. She apparently suffered a lapse of memory. The sum total of her testimony was that prior to the Kentucky fire, a strange man came to the house; he was kept outside, and Utter handed him money; and Utter told her that he was loaning the guy some money because he was down and out. (R. 7-629.) After the fire, Jernigan asked Utter if that guy had anything to do with the fire, and Utter said no. (*Id.* at 630.) The government attempted, without success, to have Jernigan testify that Utter had paid this mystery man to burn his Kentucky home. Failing in that, the government offered no evidence that the Kentucky fire was of incendiary origin. At no time did Utter seek to exclude any of Jernigan's testimony, or any other evidence, on the ground that the government had failed to establish that the Kentucky house was willfully burned and that Utter procured the burning.

The majority concludes that the trial court abused its

discretion by admitting Jernigan's testimony because no proof was presented that Utter committed the extrinsic act. But the court's ruling complained of was the ruling on Thursday, December 1, 1994, based upon the government's pretrial proffer. That ruling, in my view, was well within the trial court's discretion. As the evidence developed, the government failed to prove either that the Kentucky house was willfully burned, or that Utter procured the burning. But at this later time, after the December 1 hearing, Utter did not ask the trial court to revisit the Rule 404(b) issue. What the majority does, therefore, is find that the trial court's ruling on Thursday was an abuse of discretion because of what the trial court learned on the following Monday, when Jernigan testified.

The majority also concludes that the probative value of the Kentucky fire evidence "is substantially outweighed by the danger of unfair prejudice" and should have been excluded under Fed.R.Evid. 403. I respectfully disagree. The trial court acted well within its discretion in concluding that the evidence proffered was admissible under Rule 404(b) to prove motive and intent. Both motive and intent were issues in the case. The trial court also acted well within its discretion in concluding that this evidence was inextricably intertwined with the charged offense. I find no abuse of discretion in the trial court's rulings.

Assuming, however, that both the Kentucky fire evidence and the Bosiger testimony that Utter had threatened to "burn her out" were erroneously admitted at trial, Utter's conviction should not be set aside. In order to establish that the introduction of this

evidence requires us to remand for a new trial, Utter must show that the district court abused its discretion in admitting the evidence, and that admission of the evidence affected Utter's substantial rights. Fed.R.Crim.P. 52(a). Stated otherwise, erroneous admission of this evidence does not warrant reversal "if the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Fortenberry,* 971 F.2d 717 (11th Cir.1992) (citations omitted), *cert. denied,* 506 U.S. 1068, 113 S.Ct. 1020, 122 L.Ed.2d 166 (1993).

In this case it is not at all clear that the Kentucky fire evidence influenced the jury's decision to find guilt. The government argued in closing only that the 1988 Kentucky fire should have been reported on Utter's insurance application and was not reported because of Utter's financial difficulties and the anticipated increase in premiums had the loss been reported. The government did not argue, in closing, that Utter had willfully procured the burning of his Kentucky house, apparently realizing that its proof had fallen short.

In closing argument, the government told the jury that Bosiger's testimony was offered for the limited purpose of supporting the credibility of witnesses who had testified about Utter's threats to destroy Stormy's. As the majority notes, a number of witnesses testified that Utter had threatened to burn Stormy's. This testimony was not contradicted. Given all of this testimony, it is inconceivable that Bosiger's relatively inconsequential testimony that Utter had threatened to burn her out

at some other time and place substantially influenced the jury's finding of guilt.

At no point did Utter request a mistrial based on admission of the Kentucky fire evidence. The defense was seemingly satisfied with the government's decision to make no further attempt to establish that Utter willfully procured the burning of his Kentucky home. Similarly, the defense did not request a mistrial because of the admission of Bosiger's testimony.

Finally, I disagree with the majority's conclusion that "this was an extremely close case." The evidence in this case, viewed in the light most favorable to the government, as we are bound to view it, is substantial indeed. I would affirm Utter's conviction and reach the challenges to his sentence presented by the government's cross appeal.