[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 10, 2001
THOMAS K. KAHN
CLERK

_____

Nos. 99-12052 and 99-13303

_____

D.C. Docket Nos. 98-00198-CR-T-26C & 93-00083-CR-T-26B

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NICHOLAS GRANT,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____
**(July 10, 2001)**

Before CARNES and RONEY, Circuit Judges, and ALAIMO[*], District Judge.

_____

[*]Honorable Anthony A. Alaimo, U.S. District Judge for the Southern District of Georgia, sitting by designation.

CARNES, Circuit Judge:

Nicholas Grant appeals his convictions for conspiracy to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846, use of a firearm during a drug-trafficking crime, in violation of 18 U.S.C. § 924(c), and failure to appear, in violation of 18 U.S.C. § 3146(a)(1). These questions are presented: whether Grant's appeal on the conspiracy and firearms charges was timely; whether there was sufficient evidence to convict him on the failure to appear and the conspiracy charges; and whether statements of an alleged co-conspirator exculpating Grant were inconsistent statements admissible for purposes of impeachment pursuant to Federal Rule of Evidence 806. We answer all three questions "yes." The affirmative answer to the third one requires that we reverse Grant's conviction on the conspiracy and use of a firearm charges.

## I. BACKGROUND

### A. FACTS

In early 1993, United States Customs Service Special Agent Louis Mozas met with Deosie Wilson and discussed Wilson's plan to have Mozas smuggle 2000 pounds of marijuana from Jamaica into the United States, which Wilson would then sell. Jamaican police seized the marijuana which was to be smuggled in, however, so the transaction was not consummated.

2

Mozas next advised Wilson that Mozas would be smuggling one hundred kilograms of cocaine from Columbia, for which he would be paid 18,000 pounds of marijuana. Wilson agreed to market that marijuana for Mozas. Upon inspection, Wilson deemed the marijuana to be of poor quality, but set out to market it anyway. Mozas also advised Wilson that he had 15 kilograms of cocaine, and Wilson agreed to assist in selling it.

Wilson departed for Jamaica on March 12, 1993, and returned to Tampa on March 18, 1993. Mozas picked up Wilson at the Tampa airport and took him to an undercover residence in Homosassa, Florida. In connection with his planned purchase of the cocaine from Mozas, Wilson advised Mozas that $100,000 had been transferred into Wilson's bank account and that the funds would be available the next day. On March 19, 1993, Mozas accompanied Wilson to a bank in Homosassa, Florida and was present when Wilson obtained a cashier's check for $100,000. Mozas and Wilson then returned to the undercover residence.

Later that same afternoon, Mozas dropped Wilson off at the same bank. Wilson remained inside the bank for between one to five minutes before leaving with the occupants of a waiting Nissan Pathfinder. Undercover agents followed the Pathfinder, which drove by the undercover residence and then to a restaurant. A short while later, Wilson and Grant were observed leaving the restaurant and

3

entering the Pathfinder.  The agents followed the Pathfinder as it returned to the undercover residence, where Wilson was dropped off.  The agents then followed the Pathfinder as it returned to the restaurant.

Wilson arrived at the undercover residence carrying a bundle underneath his shirt.  The agreement between Mozas and Wilson provided that Wilson would purchase 10 kilograms of cocaine from Wilson at $15,000 per kilogram, or $150,000 total.  Wilson went into a bedroom at the residence and, upon his return, produced a vinyl pouch containing $50,000 in United States currency.

Mozas then instructed Detective Michael Joyner to bring the cocaine to the residence.  Joyner brought the cocaine and Wilson showed him the $100,000 cashier's check and $50,000 cash.  Wilson told Mozas that Grant was in Homosassa Springs, but that Grant did not want to meet anyone.  Wilson then put down $15,000, left with one kilogram of cocaine, and was arrested immediately thereafter.  Wilson was talking on a cell phone at the time of his arrest and the person to whom he was speaking was exclaiming "police, police, police."

Within one minute of being informed that Wilson had been arrested, the undercover agents observing the Pathfinder saw Grant and his brother quickly run from the restaurant and depart in the Pathfinder.  Grant drove slowly by the location where Wilson was being arrested and then fled the area at approximately

80 miles per hour. After a brief chase, Grant was arrested and a search of the Pathfinder revealed two loaded semi-automatic pistols, one in the glove compartment and another in a duffle bag on the floor in front of the back seat, and an open briefcase containing $11,208.

After his arrest, Grant told Customs Special Agent Phillip Aston that while he was in Jamaica Wilson had contacted him about participating in a marijuana transaction. Grant did not, however, mention anything about a cocaine transaction. Grant also told Aston that on March 18, 1993, he had traveled from Jamaica to Miami with approximately $16,000 in cash. Grant had a passport bearing his photograph and name which documented that he had left Jamaica on March 18, 1993. Grant admitted to Aston that he had been speaking to Wilson on the telephone before Grant had run from the restaurant, but claimed that he and his brother had decided that they did not want to participate in Wilson's transaction anymore and had decided to leave.

Grant was released on bond on March 26, 1993. Four days later, he was indicted on one count of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Grant pleaded not guilty at his arraignment. The United States requested a show cause hearing for revocation of Grant's bond on the grounds that he had failed to comply with the conditions of his release. The

5

magistrate judge scheduled a show cause hearing for May 17, 1993. On May 4, 1993, the clerk's office sent notice of that scheduled hearing to Grant. After Grant failed to appear for the show cause hearing, a warrant was issued for his arrest.

On February 16, 1998, a detective assigned to a Customs task force arrested Grant at the Miami International Airport. At the time of his arrest, Grant possessed two Jamaican driver's licenses - both bearing his photograph, but one in his name and one in the name of Rory Roberts. Grant was advised of his rights and agreed to be interviewed. During that interview, Grant stated that there was a fugitive warrant issued for his arrest and that he needed to use a different name to avoid arrest and prosecution in the United States. He explained to the detective that the fugitive warrant was the result of an arrest that had occurred in Tampa on a charge of attempting to purchase cocaine from undercover Customs agents and that he failed to appear in court and had fled to Jamaica in order to avoid prosecution on that charge.

## B. PROCEDURAL HISTORY

A superseding indictment was returned on March 19, 1998 charging Grant with one count of conspiracy to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846, and one count of use of a firearm

during a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Grant was convicted by a jury on both counts on May 19, 1998.

On May 14, 1998 Grant was indicted for failing to appear at the May 17, 1993 show cause hearing, in violation of 18 U.S.C. § 3146(a)(1). After a bench trial, Grant was convicted of that charge on October 7, 1998.

At a consolidated sentencing hearing on June 18, 1999, Grant was sentenced to imprisonment for 145 months for the conspiracy conviction, 60 months for the firearms conviction, and 6 months for the failure to appear conviction, all sentences to run consecutively. Grant filed a motion for a new trial and a renewed motion for judgment of acquittal, both of which were denied. Grant appeals his convictions on several grounds. Among other things, he argues that there was insufficient evidence to sustain his convictions on the failure to appear and the conspiracy charges. Grant also argues that evidence which would have impeached testimony elicited from Wilson at trial was improperly excluded, in violation of Federal Rule of Evidence 806.[1]

## II. DISCUSSION

---

[1]Because of our holding on this issue, we need not decide the other issues Grant raises in his appeal, including Brady violations and an Apprendi challenge to his sentencing.

## A. THE JURISDICTIONAL QUESTION

As a threshold matter, we must decide whether Grant's appeal of the conspiracy and firearms charges is timely. After Grant's consolidated sentencing hearing, the district court entered one judgment as to both cases. The judgment bore the district court case numbers for the conspiracy and firearms charges (93-83-CR-T-26B) and for the failure to appear charges (98-198-CR-T-26C). The judgment was entered on June 24, 1999 as to case number 98-198-CR-T-26C, and on June 28, 1999 as to case number 93-83-CR-T-26B.

On June 28, 1999, Grant filed a notice of appeal which stated that he was appealing "the Judgment and Committment [sic] entered in this action on June 18, 1999."[2] The notice of appeal, however, bore only one case number, 98-198-CR-T-26C (the failure to appear case).

On August 31, 1999, Grant filed a second notice of appeal bearing case number 93-83-CR-T-26B (the 1993 drug case), along with a "motion to submit an out-of-time appeal," which indicated that case number 93-83-CR-T-26B had been

---

[2]Although the district court judge signed the judgment on June 22, 1999, the judgment states that the date of imposition of sentence is June 18, 1999, which was the date that the sentence was orally pronounced. Cf. United States v. Morrison, 204 F.3d 1091, 1093-94 (11th Cir. 2000) ("imposition of sentence" in Federal Rule of Criminal Procedure 35(c) means the oral pronouncement of it, not the time the written judgment is entered).

inadvertently omitted from the first notice of appeal due to a clerical error. On October 1, 1999, the district court granted the motion to file out of time.

"The timely filing of a notice of appeal is a mandatory prerequisite to the exercise of appellate jurisdiction." United States v. Ward, 696 F.2d 1315, 1317 (11th Cir. 1983) (citations omitted). Pursuant to Federal Rule of Appellate Procedure 4(b)(1)(A), a defendant in a criminal case must file a notice of appeal within 10 days after the entry of the judgment. Grant's second notice of appeal, regarding the 1993 drug case, was not filed within this 10 day window.

Rule 4(b) authorizes a 30 day extension upon a finding by the district court that the failure to file within the original period resulted from "excusable neglect." Fed. R. App. P. 4(b)(4). Grant's second notice of appeal, however, was filed on August 31, 1999, more than 30 days late, and therefore does not fall within the Rule 4(b)(4) window, either.

Nonetheless, Federal Rule of Appellate Procedure 3(c)(4) provides that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal." The advisory committee notes to that Rule state that "so long as the function of notice is met by the filing of a paper indicating an intention to appeal, the substance of the rule has been complied with." Fed. R. App. P. 3 advisory committee note. Further, "the [R]ule makes it clear that dismissal of an appeal

9

should not occur when it is otherwise clear from the notice that the party intended to appeal." Id.; see also Smith v. Barry, 502 U.S. 244, 248-49, 112 S. Ct. 678, 682 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal.").

Although Grant's first notice of appeal only references case number 98-198-CR-T-26C, it also states that he appeals "from the Judgment and Committment [sic] entered in this action on June 18, 1999." As we have mentioned, a consolidated sentencing hearing on both cases was held in the district court, and there was only one judgment and commitment order entered for both cases. That leads us to conclude that a timely notice of appeal was filed from the single judgment and commitment order, even though that notice of appeal mentioned only one of the two case numbers. We hold that Grant's first notice of appeal indicates an intent to appeal both cases and that we do have jurisdiction. See Cobb v. Lewis, 488 F.2d 41, 44 (5th Cir. 1974) ("Courts of appeals have discretion, when the interests of substantive justice require it, to disregard irregularities in the form or procedure for filing a notice of appeal."), abrogated on other grounds, Kotam Elects., Inc. v. JBL Consumer Prods., Inc., 93 F.3d 724 (11th Cir. 1996).

## B. SUFFICIENCY OF EVIDENCE TO CONVICT ON THE FAILURE TO APPEAR CHARGE

Grant argues that there was insufficient evidence to support his conviction for failure to appear in violation of 18 U.S.C. § 3146(a)(1), because there was no direct evidence that he received notice of the May 17, 1993 hearing on the order to show cause. He suggests that we conduct a de novo review of the evidence.

We cannot try the case de novo but instead must sustain the verdict if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942). In deciding whether there was, we view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences and credibility choices. Id.; United States v. Middleton, 690 F.2d 820, 827 (11th Cir. 1982).

The evidence shows without dispute that the clerk's office sent Grant notice of a hearing on an order to show cause concerning modification or revocation of his bond, which was scheduled for May 17, 1993, and that Grant did not appear at that hearing. He was arrested almost five years later, and at the time of his arrest he was using an alias. He also told the arresting detective that he had skipped bond and fled the country in order to avoid prosecution. He admitted to the detective that he knew there was a warrant issued for his arrest and said that he had been using a false name to avoid arrest. He specifically said that he had failed to appear in court. That is more than sufficient evidence to support the conviction.

## C. SUFFICIENCY OF THE EVIDENCE TO CONVICT
## ON THE CONSPIRACY CHARGE

Next, Grant contends that there was insufficient evidence to establish that he knowingly agreed to join or participate in a conspiracy with Wilson to possess and distribute cocaine and marijuana.[3] He argues that his presence and association with Wilson, coupled with evidence of flight, is insufficient to sustain his conspiracy conviction.

In order to establish the existence of a drug conspiracy between Grant and Wilson, the government must prove that there was an agreement between the two of them to violate the narcotics laws. See United States v. Farris, 77 F.3d 391, 394 (11th Cir. 1996); United States v. Blasco, 702 F.2d 1315, 1330 (11th Cir. 1983). The existence of a conspiracy can be established by either direct evidence or circumstantial evidence, such as inferences drawn from conduct. Farris, 77 F.3d at 394; Blasco, 702 F.2d 1330.

The evidence supporting Grant's involvement in the conspiracy, viewed in the light most favorable to the conviction, is as follows. Grant traveled from Jamaica to Florida on March 18, 1993, the same day that Wilson traveled from Jamaica to Florida to conduct the cocaine transaction and one day before the

---

[3]Grant does not challenge the sufficiency of the evidence to support his conviction on the firearms charge.

transaction occurred.  Grant then met Wilson at a bank, they left the bank together, and they drove by the residence where the cocaine transaction was to occur.  Grant and Wilson then went to a restaurant, and after a short while Grant drove Wilson, who now possessed $50,000 in currency, to the residence of the undercover agent.  At that residence, Wilson took delivery of one kilogram of cocaine and left after telling the agent that he was going to deliver the cocaine to the buyer.  At the time of Wilson's arrest, almost immediately after his departure from the residence, he was on the telephone with Grant.  Following his arrest, Grant admitted to the agent that while he was in Jamaica he had been contacted by Wilson to come to the United States to participate in a marijuana transaction.  Grant was arrested after a high-speed flight from the area following Wilson's arrest, and there were loaded weapons and a large amount of cash in the vehicle.  Grant later fled the country in order to avoid prosecution.

Based on this evidence, a reasonable jury could find beyond a reasonable doubt, as the jury in this case did, that Grant was guilty of conspiracy to possess with intent to distribute cocaine and marijuana.  See Farris, 77 F.3d at 394-95.

## D.  THE RULE 806 ISSUE

At trial, the government used as evidence against Grant statements that had been made by co-conspirator Wilson during the course of the conspiracy. Those statements were admitted under Federal Rule of Evidence 801(d)(2)(E), which allows co-conspirator statements to be admitted as substantive evidence against a defendant. Agent Mozas testified extensively regarding statements Wilson had made to him during the course of the conspiracy while Mozas was acting undercover. Those statements involved: (1) Wilson's plans to import marijuana into the United States; (2) Wilson's claims that he had a partner in Jamaica who was his neighbor; (3) Wilson's comments that he had buyers who would assist him in distributing marijuana and cocaine; and (4) Wilson's intent, after purchasing one kilogram of cocaine from the undercover agent, to take the cocaine to his partner for testing and evaluation.

The statements of Wilson that Mozas testified about on direct examination did not directly mention Grant, but on cross-examination when asked whether Grant was ever present during any of the transactions between the undercover agents and Wilson, Mozas testified that Wilson had told him Grant was in Homosassa Springs and did not want to meet with anyone.

Grant attempted to impeach the Wilson conspiracy statements that had been put into evidence through Mozas' testimony by introducing an affidavit which an

14

attorney for Grant had obtained from Wilson in Jamaica. The affidavit was executed after the conspiracy ended and following Wilson's deportation to that country. The affidavit contained Wilson's sworn statements: that Grant had no knowledge of Wilson's actions in consummating the drug deal with the agents; that Wilson had falsely told the undercover agents he had a partner because Wilson did not want them to think he was acting alone; that Wilson had asked Grant to meet him in Tampa to loan him money; that none of the $50,000 in cash Wilson possessed came from Grant; and that Wilson had lied to the undercover agents about Grant not wanting to meet with anyone because Wilson was carrying a large amount of cash and wanted the undercover agents (whom he believed to be criminals) to think he had a partner. The district court refused to admit any of Wilson's affidavit statements, however, finding that they were not inconsistent, as required by Rule 806, with the statements of Wilson admitted through Mozas' testimony.

Federal Rule of Evidence 806 provides, in relevant part:

When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

15

Fed. R. Evid. 806.

The government's principal argument mirrors the district court's reasoning that none of the statements in Wilson's affidavit are inconsistent with or contradictory to Wilson's conspiracy statements which were admitted through Mozas' testimony. The government points out that none of Wilson's conspiracy statements which were admitted at trial specifically identify Grant as Wilson's partner or as the source of any money used in the transaction. The only testimony that specifically identifies Grant, which was that Wilson had told the agents Grant was in Homosassa Springs and did not want to meet anyone, was elicited by Grant on cross-examination of Wilson and was not, the government contends, contradicted by anything in Wilson's affidavit.

The government's conception of inconsistency is too narrow. Although Grant was specifically identified by Mozas only during cross-examination, his testimony in its entirety did circumstantially link Grant to the conspiracy. At the very least, it indicated that Wilson had a co-conspirator. The government attempted to avoid Rule 806 by carefully ensuring that Mozas, in testifying about Wilson's statements during the conspiracy, never specifically identified Grant as Wilson's co-conspirator, at least on direct examination, and then presenting other evidence

16

indicating that Grant was Wilson's co-conspirator.[4]  Wilson's statements in the proffered affidavit, however, indicate that he had no co-conspirator and, further, that Grant had no involvement in Wilson's drug transactions.

The Rule 806 test is not whether the inconsistent statements relate to the identity of  co-conspirators; that's not what the Rule says.  Instead, it says that "any" evidence is admissible "which would be admissible . . . if [the] declarant had testified as a witness" from the stand.  Fed. R. Evid. 806.  If Wilson had been called as a witness and testified, for example, that he was taking the cocaine he was buying to his partner to test and evaluate it, his affidavit statements indicating that he had lied to the agents when he told them he had a partner would surely be admissible.  Likewise, if Wilson had testified and during cross-examination had said that Grant did not want to meet with anyone, his affidavit statement that he had lied about that would be admissible to impeach him.  The test is whether the out-of-court statements would have been admissible for impeachment purposes had the co-

---

[4]That other evidence included the fact that Grant traveled from Jamaica to Florida on the same day that Wilson did, met Wilson at a bank and left with him, and they drove by the undercover residence together.  Grant and Wilson also went to a restaurant together, before Grant drove Wilson, who possessed $50,000 in cash, to the undercover residence.  At the time of his arrest, Wilson was on the telephone with Grant, and Grant admitted that while he was in Jamaica Wilson had contacted him to come to the United States to participate in a marijuana transaction.  Grant was also arrested after a high-speed flight shortly after Wilson's arrest in a vehicle containing two firearms and a large amount of cash.  Grant later fled the country to avoid prosecution.

conspirator statements been delivered from the witness stand by the co-conspirator himself, not as hearsay about what he said during the conspiracy but as contemporaneous in-court statements.

The government's position in this case echos its unsuccessful argument in United States v. Wali, 860 F.2d 588 (3d Cir. 1988), which involved a remarkably similar Rule 806 issue. That case involved Abdul Wali's conviction on charges of conspiracy to import Schedule I controlled substances in violation of 21 U.S.C. §§ 846 & 963. Wali, 860 F.2d at 589. An undercover DEA agent testified at Wali's trial as to statements made during the conspiracy by a drug kingpin, Stanley Karl Esser, which implicated a person named "Hadji" as the source of narcotics. Id. The district court, however, denied Wali's attempt to impeach Esser's credibility by admitting inconsistent statements Esser had made to the undercover DEA Agent and to Dutch authorities which exonerated Wali. Id. at 589-90.

On appeal, the government argued that Esser's exculpatory statements were not inconsistent and therefore not admissible pursuant to Rule 806, because in his inculpatory co-conspirator statements "Esser never stated that Abdul Wali was either the source of his narcotics or the 'Hadji' who supplied him." Id. at 591. The government claimed that Wali's identity as the "Hadji" who supplied the narcotics was established only circumstantially through evidence other than the co-

conspirator statements.  Id.  The Third Circuit rejected that argument, holding that

although Esser's co-conspirator statements never specifically identified Wali as the

"Hadji" who was the source of his narcotics, the government had used those

statements to prove the existence of a conspiracy to import drugs, thereby

inculpating Wali.  Id.

The Third Circuit's analysis in Wali is sound and fits snugly onto our facts.

The government used Wilson's co-conspirator statements to help establish the

existence of a conspiracy to distribute cocaine and marijuana, which is one of the

elements of the crime charged against Grant.  The statements in Wilson's affidavit

were inconsistent with the existence of any conspiracy at all, and for that reason

were inconsistent with his co-conspirator statements.

The government's first fallback argument is that even if the co-conspirator

statements of Wilson admitted at trial were inconsistent with the affidavit

statements, the affidavit is inadmissible under Federal Rule of Evidence 403[5]

because its probative value is outweighed by its prejudicial effect.  That is not the

ground upon which the district court excluded the evidence.  Nonetheless, the

---

[5]Federal Rule of Evidence 403 provides, in relevant part:

Although relevant, evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice . . .

Fed. R. Evid. 403.

19

government maintains that the affidavit evidence would be unfairly prejudicial because the statements, if believed, would provide Grant with a complete defense, rather than merely impeaching Wilson's co-conspirator statements admitted through Mozas.

Rule 403 is an "extraordinary remedy," United States v. Utter, 97 F.3d 509, 514-15 (11th Cir. 1996) (citation omitted), whose "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect," United States v. Cross, 928 F.2d 1030, 1048 (11th Cir. 1991) (internal quotation omitted). The Rule carries a "strong presumption in favor of admissibility." United States v. Church, 955 F.2d 688, 703 (11th Cir. 1992). Wilson's inculpatory co-conspirator statements were important pieces of evidence in the government's case. The impeaching statements in the affidavit would serve to cast doubt on Wilson's credibility and would have significant probative value for that purpose. Whatever prejudice to the government that might occur from admitting the affidavit statements could not substantially outweigh their probative value, anymore than it could if those affidavit statements had been admitted for impeachment following live testimony of Wilson to the same effect as his co-conspirator statements. The evidence of the affidavit statements could do no more than impeach and could not provide "a complete defense" if the government

20

requested the limiting instruction to which it would have been entitled.  See Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 733 (2000) ("A jury is presumed to follow its instructions.").

The government's second fallback argument is that Wilson's affidavit statements were properly excluded from evidence because they were particularly unreliable, even though that was not the basis of the district court's ruling.  The government points out that Wilson continued to inculpate Grant in the conspiracy after his arrest and before a federal grand jury, and only gave statements exculpating Grant after he had been deported to Jamaica and was no longer subject to prosecution for perjury.[6]  The government maintains that because the statements in the affidavit were so unreliable, admitting them would not have affected the outcome of the trial – sort of a harmless error argument.

The government's argument on this point is more than a little inconsistent with its Rule 403 argument that the affidavit statements were terribly prejudicial to

---

[6]Federal Rule of Evidence 806 provides that if the credibility of the declarant is attacked, it may be supported by any evidence which would be admissible for those purposes if he testified as a witness.  We have no occasion to express a view upon whether the other out-of-court statements of Wilson, such as his grand jury testimony, will be admissible once his affidavit statements come into evidence.

Likewise, we do not have occasion to decide at this time whether, by giving affidavit statements as Wilson did in this case, a co-conspirator waives his privilege against self-incrimination.  Nor do we express any view on whether, if the government attempts to depose the co-conspirator affiant or call him to the stand, and he refuses to answer questions on the subject matter addressed in his affidavit statements, those statements must be stricken.

21

its case. Putting that inconsistency aside, however, Rule 806 made the statements admissible for impeachment purposes, and the point of admitting inconsistent statements to impeach is not to show that they are true, but to aid the jury in deciding whether the witness is credible; the usual argument of the party doing the impeaching is that the inconsistent statements show the witness is too unreliable to be believed on important matters. See United States v. Graham, 858 F.2d 986, 990 n.5 (5th Cir. 1988) ("[T]he hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement is not hearsay within the meaning of the term, i.e., it is not offered for the truth of the matter asserted, see Fed. R. Evid. 801(c); rather, it is offered only to establish that the witness has said both 'x' and 'not x' and is therefore unreliable."). Given all the circumstances of this case, that strategy might well have worked to undermine the probative effect of Wilson's co-conspirator statements to such an extent that the verdict on the conspiracy charge would have been different. For that reason, we reverse Grant's conviction on that charge.

As to Grant's conviction for using a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c), the conspiracy was the only drug trafficking crime that the indictment alleged as that essential element of the firearms charge.

Accordingly, the exclusion of the affidavit statements also requires reversal of Grant's conviction on the firearms charge.

## III. CONCLUSION

There was sufficient evidence to support Grant's conviction for failure to appear and we AFFIRM his conviction on that charge. We do have jurisdiction over Grant's appeal of the conspiracy and firearms charges, and there was sufficient evidence to support Grant's conviction on those charges. However, the district court erroneously excluded Wilson's statements contained in his affidavit and, accordingly, we REVERSE the judgment of conviction and sentence for both the conspiracy and firearms charges, and REMAND for further proceedings consistent with this opinion.