IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2005

## ALAN E. MONDAY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County
No. 77421     Richard R. Baumgartner, Judge**

_____

**No. E2005-00614-CCA-R3-PC - Filed November 4, 2005**

_____

The petitioner, Alan E. Monday, appeals from the Knox County Criminal Court's dismissal of his petition for post-conviction relief from his conviction for reckless homicide, a Class D felony. He contends that he received the ineffective assistance of counsel because his attorney advised him not to testify and failed to call a favorable witness. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Alan E. Monday.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the petitioner's conviction for shooting the victim, Beverly Reichenbach, in the petitioner's brother's apartment. A Knox County grand jury indicted the petitioner for one count of reckless homicide and a Knox County Criminal Court jury convicted him as charged. The petitioner appealed and this court affirmed his conviction. See State v. Alan E. Monday, No. E2001-01426-CCA-R3-CD, Knox County (Tenn. Crim. App. Feb. 12, 2003).

The evidence produced at the trial showed that on September 29, 1996, at approximately 6:30 p.m., the victim telephoned Jack Monday, the petitioner's brother, and asked him to "come and get her." The victim was the petitioner's ex-girlfriend. Jack Monday refused to pick up the victim because he had been drinking and knew the victim was "doing drugs." Later that night, the victim again called Jack Monday, crying and threatening to commit suicide. Jack Monday said he would

pay for a cab to bring her to his apartment. The victim arrived around 8:00 p.m., but left soon after to pick up medicine from her mother. She returned to the apartment and went into the bathroom and injected herself with cocaine. Jack Monday denied that the victim had ever been his girlfriend but admitted having sex with her that night because the victim was depressed and he thought it would make her feel better. He said the victim seemed to feel better for about an hour and then became upset again. Jack Monday tried to console the victim. He continued drinking beer and took a muscle relaxer given to him by the victim. He passed out on the couch around midnight.

At approximately 3:00 a.m. on September 30, 1996, the petitioner knocked on the door of Leonard Parrot, a neighbor of Jack Monday's, and asked him to call 9-1-1. The petitioner appeared in a panic and scared, and the victim was lying face down in the hallway.

Sheila Miller, who also lived in the building, was awakened by gunshots and glass shattering in the parking lot and noticed a van that "just took off -- just flew." She then heard someone say, "Goddam [sic] . . . you didn't have to kill her, man." She heard someone banging on a door and her neighbor, Leonard Parrot, say "I can't help you man." A short time later, Ms. Miller came out of her apartment and saw the victim lying in the hallway and the petitioner standing over her. He was wearing boots, jeans, and a belt, but no shirt. He had blood on his chest and hands.

Knoxville Police Department Officer Larry Murrell was the first police officer to arrive at the scene. He found the victim lying face down in a pool of blood in the fourth floor hallway. The victim was not moving and did not respond. A trail of blood extended from the victim to Jack Monday's apartment. Officer Murrell secured the scene and waited for other officers to arrive.

Knoxville Police Department Officer Kathy Pappas arrived at the scene. She and Officer Murrell knocked on the door of Jack Monday's apartment, and he opened the door and allowed them inside. The officers noticed that the apartment was in disarray, that there was a bullet and a .38 caliber shell on the floor, and that there was a pool of blood by the front door.

Knoxville Police Department Sergeant Dick Evans arrived at the scene while the victim's body was still in the hallway. While standing in the hallway, the petitioner approached Sergeant Evans, wearing jeans and boots and carrying a coke. The petitioner told Sergeant Evans that he was looking for his girlfriend, that he lived in the building, and that his name was Alan. The petitioner said, "She shot herself. She is a dope head, f---ing everybody. She is mad at me, because she caught me with another woman."

Knoxville Police Department Captain Gordon Catlett, Jr., walked out of the apartment, approached the petitioner, and questioned him about what had happened. The petitioner responded, "Well, she shot herself." He told Captain Catlett the gun could be found in the victim's hand, then said it was in her boot, and then said it was under the victim. The petitioner was handcuffed and placed in the back of a patrol car. Captain Catlett noticed fresh claw marks on the petitioner's back and a bloodstain on the back of his right hand. The petitioner was "ranting on about the victim, and his brother, and him" and said, "My brother didn't have anything to do with it."

While searching for the gun, Captain Catlett noticed an open window in the apartment. The window overlooked the apartment's parking lot. Captain Catlett went to the parking lot and found a .38 caliber handgun. Jack Monday testified that the gun used to kill the victim had been stored in the bedroom of his apartment but that it belonged to the victim. He said the petitioner knew where the gun was stored.

Sergeant Evans transported the petitioner to the third floor of the police department. Knoxville Police Department Criminal Investigator Michael Pressley interviewed the petitioner and advised him of his Miranda rights and had him sign a waiver. During the interview, the petitioner gave eight different versions of the events. The petitioner stated that

> he committed the homicide; that the victim committed suicide; that he was in the laundry room and not even present when the shooting occurred; that the victim was involved in a "drug rip-off and some black men" shot her; that he was innocent and so was his brother; that the victim was involved with crack cocaine dealers; that the victim shot herself; and that the victim had been killed by a "Mexican whore."

The petitioner maintained he loved the victim and would not have done anything to hurt her. The petitioner smelled of alcohol and talked about using drugs. However, he was released several hours after being taken into custody.

While being interrogated by Investigator Pressley, the petitioner stated he needed to use the restroom. Sergeant Evans escorted him to the restroom, and as they entered, the petitioner pushed passed Sergeant Evans and attempted to wash his hands. Sergeant Evans would not allow him to wash his hands. Later, he stated his stomach was upset and needed to go to the restroom. He again tried to wash his hands. The petitioner also attempted to get to the water fountain. Officer Crenshaw, the evidence technician, did "atomic absorption" testing on the petitioner's and Jack Monday's hands. However, the tests were not sent for analysis, because both had washed their hands, making the results unreliable. Officer Crenshaw did not perform an atomic absorption test on the victim. The petitioner voluntarily returned to talk with Investigator Pressley on several occasions and consented to the blood testing and gunshot residue testing.

Two days after the shooting, Ms. Miller was in the lobby of the apartment building and she saw the petitioner talking with two people. She heard him say, "Yeah, I did them a damn favor. . . . Just another whore off the damn street." She did not initially tell police officers about this conversation for fear she would be evicted from the building.

On October 3, 1996, Knoxville Police Department Officer Gary Anders interviewed the petitioner. The petitioner told him the victim had been sitting on the couch when he noticed she had a gun in her purse or between two of the cushions on the couch. He said he reached for the gun, but

the victim grabbed the weapon. He said they struggled over the gun and his finger must have pulled the trigger, causing the gun to discharge and strike the victim.

Dr. Paul Googe performed the autopsy on the victim. Dr. Googe testified that the victim died from a large caliber gunshot wound to the head. The victim had some bruising, broken fingernails, and evidence of recent intravenous drug use. He did not find stippling, burns, or cuts near the wound, indicating the gun was fired some distance from the face. The direction of the bullet was "straight in from the place that it was located until it hit the back of the skull." Toxicology reports indicated the victim had alcohol, cocaine, promethazine, and meprobamate in her system. Dr. Googe stated he believed it was "very unlikely" the victim committed suicide. He said, "[I]t seems to be a distant wound, and that is the main finding that would seem unusual for suicide." Dr. Googe admitted that he reached his conclusion partly on the belief that women rarely commit suicide with firearms.

| [DEFENSE] | Okay. So it is just your opinion that it is unlikely that this is a suicide attempt; because, in your opinion, women don't generally use firearms. |
|---|---|
| [DR. GOOGE] | That was one of the reasons, yes. . . . I think that the wound is the main finding that would suggest that this was not a suicide. |

He also admitted he could not comment on whether the victim was shot during a struggle over the gun.

| [DEFENSE] | You have been asked about whether this appears to be, I guess, a self-inflicted injury. Do you have any opinion of whether this injury would be consistent with a situation where there was a struggle over a weapon, and the weapon discharges as someone is trying to take a weapon away? |
|---|---|
| [DR. GOOGE] | I don't believe I can comment on that much one way or the other. |
| [DEFENSE] | So you just can't say either way if that is possible or not? |
| [DR. GOOGE] | It's -- it's possible. |

On June 2, 2003, the petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel. He alleged his trial attorney improperly advised him not to testify at trial, failed to call a favorable witness, and failed to admit the victim's suicidal statements into evidence.

The petitioner was unable to attend the post-conviction hearing in this matter because he was in federal custody, but his post-conviction counsel entered his affidavit as an exhibit at the hearing. The petitioner stated in his affidavit that his brother invited him, his girlfriend, and a few other people to his apartment to eat and to watch a football game. He stated his brother told him the victim had called, crying and threatening to kill herself. He stated the victim came to the apartment but left and returned several times. The petitioner stated, "She was constantly making [reference] to killing herself and that her children hated her and she was sick of life." He stated the victim continued talking about killing herself, which made everyone leave except the petitioner's girlfriend, who did not leave until she and the victim had an argument.

The petitioner stated that the victim was sitting on the couch next to Jack Monday, who was passed out, and that she was crying and talking about killing herself. He stated she went to the bedroom and returned to the couch. He stated he was standing at the stove when he noticed a bullet roll across the floor and turned and saw the victim holding the gun toward her mouth or face. He stated that he ran to the victim to stop her, that a struggle ensued, and that the gun discharged. He stated he thought his brother had been shot because he did not move. He stated he picked up the gun and threw it out the window because he did not want the victim to have it. He stated he yelled at the victim "if she wanted it to go get it and go somewhere else" and then returned to the victim and saw the blood. He stated that he tried to call 9-1-1 but that the telephone was not working.

The petitioner stated that he tried to take the victim to Jack Monday's car to drive her to the hospital but that he could only carry her to the hallway where he fell in front of Mr. Parrot's door. He stated that he banged on the door and asked Mr. Parrot to help him take the victim to the hospital but that Mr. Parrot said he would only call 9-1-1. He stated that he started CPR and ran down to the payphone in the lobby but that it was out of order.

The petitioner stated that he returned to the fourth floor where the victim was lying and told a police officer that he had the neighbor call 9-1-1. He stated he could not remember what happened after that until he was asked "to give a gun powder test on [his] hands." He stated he was "scared, in shock, crying and exhausted" while being questioned by Detective Pressley. He stated that he took a polygraph test and gave a DNA sample at the request of Detective Pressley.

Jack Monday, the petitioner's brother, testified at the post-conviction hearing that he talked to the victim on the night she was killed. He said that he talked to her on the telephone, that she sounded very depressed, and that she wanted to kill herself. He said the victim was very upset when she arrived at his apartment. He said she had recently been released from jail where she had been on suicide watch. He said he testified at the trial but was told by his brother's trial attorney and the

-5-

trial court not to repeat the victim's exact words. He admitted he testified about several conversations he had with the victim that night about her wanting to commit suicide.

William Monday, the petitioner's brother, testified at the post-conviction hearing that he was the victim's ex-boyfriend. He said he talked with her on the telephone the night she was killed. He said he was at the trial but did not testify. He said that the victim had been released from jail three days earlier and that he picked her up and drove her to a "dope house." He said she was there for three days before calling and asking for someone to pick her up. He said that he told the victim he would not pick her up. He said the victim told him that she failed to report to her probation officer and that she was not going to go back to jail. He said the victim told him that she was going to kill herself if someone did not pick her up from the "dope house." He said he saw the victim when she arrived at his brother's apartment but left when she arrived. He testified he met with the petitioner's trial attorney and told him all of this information. He admitted he had been convicted of attempted burglary and burglary.

The petitioner's trial attorney testified at the post-conviction hearing that he had been practicing criminal defense for almost fifteen years. He said that part of the petitioner's defense at trial was that the victim was suicidal and that the shooting was connected to an attempted suicide. He said the trial court instructed Jack Monday not to repeat the victim's exact words. However, he said this did not prevent the defense from communicating its theory of suicide to the jury. He said "we were able to do everything but get the actual words of her suicide threat in." He said that he met with William Monday before trial but that the meetings did not develop anything which he could use at the trial. He said he could not remember why he decided not to call William Monday as a witness. He said the prosecutor made reference to the suicide threats and referred to the victim as "this suicidal lady" in one question. He said the jury had the victim's psychological records because he introduced them as an exhibit at the trial. He said that he was able to develop fully the theory of suicide and that the jury understood the victim was suicidal. He said he also argued the theory of suicide to the jury in the opening and closing statements.

The trial attorney testified that he always told clients the decision to testify is one of the two areas over which the client has absolute control. He said he advised clients to testify if he believed it was in their best interest but maintained the client had control over the decision. He said he spoke to the petitioner on a number of occasions about the possibility of him testifying. He said they were never successful in developing a strategy on how to deal with the eight different versions of the events the petitioner gave to police. He said the petitioner wanted to tell the jury how much he cared for the victim but "as we worked through that, it became clear to me that if he were to testify it would hurt his case, not help his case, and I told him that." The trial attorney said the petitioner understood that he had a right to testify and that it was his decision. He said he would not change his advice not to testify if given the opportunity.

After reading the petitioner's affidavit, listening to the testimony, and considering the arguments of counsel, the trial court dismissed the petition for post-conviction relief. It found that

the petitioner's claim that he received the ineffective assistance of counsel because he was advised not to testify was without merit. The trial court stated that the petitioner's trial attorney advised him

> not to testify because in reviewing the prior statements given by Mr. Monday there was, candidly, no way to reconcile the many versions of the story that he had previously told the police and that [petitioner's trial attorney] felt that this would be counterproductive for Mr. Monday to testify to the jury, and that Mr. Monday agreed with that analysis and chose not to testify.

The trial court also found the exact words of the victim were hearsay and did not fit under the hearsay exception as listed in Rule 803(3) of the Tennessee Rules of Evidence. It stated that even if the victim's exact words were admissible under a hearsay exception, the refusal to allow them into evidence was harmless because the petitioner fully raised the issue of suicide and it was properly before the jury.

The petitioner contends the trial court erred in denying his petition for post-conviction relief. He claims he received the ineffective assistance of counsel when his trial attorney advised him not to testify and failed to call William Monday as a witness. The state contends the petitioner did not receive the ineffective assistance of counsel. It asserts the trial attorney's advice not to testify was a logical strategy. Regarding the hearsay evidence, the state claims that the petitioner has failed to prove prejudice because William Monday's testimony was cumulative to other testimony presented at the trial and that the issue of suicide was properly before the jury.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test.  See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997).  The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct at 2068.  "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id.  Failure to satisfy either prong results in the denial of relief.  Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases.  Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973).  Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).  Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance.  Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  See  DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

## I. DECISION NOT TO TESTIFY

The petitioner contends that he received the ineffective assistance of counsel because his trial attorney advised him not to testify.  He asserts his defense provided no direct evidence that the victim actually shot herself and that evidence was only available from his testimony.  He claims that although his trial attorney advised him not to testify because of the multiple inconsistent statements he gave police, the inconsistent statements came into evidence anyway.  He claims he should have testified in an attempt to explain those inconsistencies.  The state contends the petitioner's trial attorney represented the petitioner "zealously and professionally."  It asserts that his advice was founded in common sense and reason and that the decision not to testify was a reasonable strategy adopted by the petitioner and his trial attorney and therefore does not constitute the ineffective assistance of counsel.  We agree with the state.

At the post-conviction hearing, the petitioner's trial attorney testified that he advised the petitioner not to testify because he had given eight different versions of the events.  He also said he believed it would be counterproductive for the petitioner to testify.  We note that at the trial the petitioner elected not to testify and stated he did not want to testify in open court when questioned by the trial court. We conclude that based upon the petitioner's inconsistent versions of the event,

the petitioner's trial attorney's advice not to testify was a well-informed trial strategy and does not constitute the ineffective assistance of counsel. The petitioner is not entitled to relief.

## II. FAILURE TO CALL A FAVORABLE WITNESS

The petitioner contends he received the ineffective assistance of counsel because his trial attorney failed to call William Monday as a witness to corroborate the testimony of Jack Monday. He asserts that he was prejudiced by not presenting evidence that would have corroborated testimony about the intent of the victim to commit suicide and the theory that the victim did commit suicide. The state contends the petitioner failed to show that decisions by his trial attorney were error or that any prejudice resulted. The state asserts the testimony of William Monday would have been inadmissible hearsay and cumulative to the testimony of Jack Monday.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as provided by the rules of evidence or otherwise by law. Tenn. R. Evid. 802. One exception to the hearsay rule is Tennessee Rule of Evidence 803(3), which allows the admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, (such as intent, plan, motive, design, mental feeling, pain, and bodily health). . . ." The Advisory Commission Comments to this section note that declarations to prove mental state at issue or subsequent conduct are admissible. See United States v. Veltmann, 6 F.3d 1483, 1494 (11th Cir. 1993) (holding that a threat of suicide was admissible over a hearsay objection under Federal Rule of Evidence 803(3)). We conclude the victim's statements concerning her intent to commit suicide on the night of her death should have been allowed under Rule 803(3). However, the defense's evidence at trial showed that on the night of her death, the victim was very upset and threatening to commit suicide. Additionally, the defense entered the victim's medical records as an exhibit, showing the victim's long history of severe depression and recent depression.

The evidence at trial showed that when Jack Monday passed out on the couch, the victim, the petitioner, and the petitioner's girlfriend were the only people left in the apartment where the shooting occurred. After the shooting, the petitioner dragged the body of the victim out of the apartment and shut the door. The petitioner knocked on his neighbor's door and asked for help with the victim. When officers arrived, the petitioner was not in the area, but officers followed the trail of blood to Jack Monday's apartment. The apartment was in disarray, and the officers found blood, a bullet, a .38 caliber shell case, and a pool of blood inside the apartment by the front door, indicating the victim was left lying there. The petitioner was arrested at the scene and taken down to the police department where he gave eight different versions of the events. One statement he gave was "I did it." Two days after the shooting, a neighbor heard the petitioner say, "Yeah I did them a damn favor. . . . Just another whore off the damn street." Additionally, Dr. Googe performed the autopsy and found no stippling around the wound, indicating the gun was fired from a distance.

We conclude that the petitioner failed to prove by clear and convincing evidence that his trial attorney's failure to call William Monday as a witness likely affected the outcome of the trial. The petitioner presented the theory of suicide during trial and in his opening and closing arguments, placing the theory of suicide before the jury, which obviously chose to reject it. The petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE